RUSHEN, DIRECTOR, CALIFORNIA DEPARTMENT
OF CORRECTIONS, ET AL. *v.* SPAIN

No. 82–2083.   Decided December 12, 1983

PER CURIAM.

Respondent was one of six inmates involved in a 1971 San Quentin Prison escape that resulted in the death of three prisoners and three corrections officers. The State of California jointly tried respondent and five other prisoners on numerous charges, including murder, conspiracy, and assault. The prosecution attempted to show that the Black Panther Party had organized the escape attempt and to link respondent to the conspiracy through his membership in that Party. Respondent's defense was that state police had organized the breakout and ambushed the escapees to eliminate an important faction of the Black Panther Party.

During *voir dire*, the court admonished prospective jurors to reveal their associations, if any, with crimes of violence and their attitudes toward radical groups, including the Black Panthers. Patricia Fagan, who became a juror, testified at *voir dire* that she had no personal knowledge of violent crimes—as a witness, victim, or otherwise—and that she did not associate the Black Panther Party with any form of violence. However, in the course of the 17-month-long trial, evidence was introduced of a crime, unrelated to those at issue in respondent's trial, of which juror Fagan had some knowledge. A defense witness identified a Black Panther named Pratt as a police informant involved in the alleged

police plot. The prosecution sought to impeach this witness by introducing evidence that Pratt was in custody for the 1968 murder of a Santa Monica woman during the entire period at issue. This evidence triggered juror Fagan's recollection of the murder of a childhood friend, who was the woman Pratt had been convicted of killing.

Upon hearing the evidence about Pratt, juror Fagan twice went to the trial judge's chambers to tell him of her personal acquaintance with Pratt's 1968 murder victim. She told him that she feared that she might cry if the 1968 murder were explored further at trial. The judge asked her on each occasion whether her disposition of the case would be affected. She assured him that it would not. The judge told her not to be concerned and that the matter probably would not be mentioned again. He made no record of either conversation, and he did not inform the defendants or their counsel about them.

At the close of trial, the jury found respondent guilty of two counts of murder and of conspiracy to escape, and acquitted him of the remaining charges. The jury also convicted two other defendants of assault, and found insufficient evidence to support the numerous remaining charges. Respondent was sentenced to life imprisonment.

Counsel for respondent subsequently learned of the *ex parte* communications between judge and juror and moved for a new trial. At a hearing on the motion, juror Fagan testified that she had not remembered her friend's death during *voir dire* and that her subsequent recollection did not affect her ability impartially to judge respondent's innocence or guilt. She admitted telling other jurors that she personally knew Pratt's 1968 murder victim, but denied making any disparaging remarks about the Black Panther Party. The trial judge concluded that the *ex parte* communications "lacked any significance" and that respondent suffered no prejudice therefrom. See App. C to Pet. for Cert. 22. Accordingly, he denied the motion for new trial.

The California Court of Appeal affirmed the conviction. It found the *ex parte* communication to be federal constitutional error that was harmless "beyond a reasonable doubt" because the jury's deliberations, as a whole, were unbiased. *Id.*, at 28–35. The California Supreme Court denied review.

Respondent then petitioned for a writ of habeas corpus in Federal District Court. The District Court issued the writ, ruling that the *ex parte* communications between judge and juror violated both respondent's right to be present during all critical stages of the proceedings and his right to be represented by counsel. 543 F. Supp. 757 (ND Cal. 1982). Furthermore, the District Court held that automatic reversal was necessary because the absence of a contemporaneous record made intelligent application of the harmless-error standard impossible. Alternatively, it concluded that a post-trial hearing could not establish that the constitutional error was harmless beyond a reasonable doubt. Thus, it found that respondent's conviction had to be vacated because of the state court's failure to hold a contemporaneous hearing about, or to make a contemporaneous record of, the *ex parte* communication. The Court of Appeals for the Ninth Circuit affirmed on the basis that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error.[1] Judgment order reported at 701 F. 2d 186 (1983).

We emphatically disagree. Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant.[2] "At the same time and without detracting from

---

[1] Respondent also argued that his due process right to be presumed innocent was violated when he was forced to stand trial shackled and chained. Neither the District Court nor the Court of Appeals reached this issue. Given our disposition of the case, this issue only remains to be resolved on remand.

[2] Petitioners have apparently conceded, in both federal and state court, that the undisclosed *ex parte* communications established federal constitutional error. See Pet. for Cert. 29–31. We acknowledge that the trial

the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests." *United States* v. *Morrison*, 449 U. S. 361, 364 (1981); see also *Rogers* v. *United States*, 422 U. S. 35, 38–40 (1975). In this spirit, we have previously noted that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith* v. *Phillips*, 455 U. S. 209, 217 (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal

---

judge promptly should have notified counsel for all parties after the juror approached him. Whether the error was of constitutional dimension in this case is not before us. Because we find that no actual prejudice was shown, we assume, without deciding, that respondent's constitutional rights to presence and counsel were implicated in the circumstances of this case.

JUSTICE STEVENS suggests that the only constitutional right implicated in this case is a possible due process right to a midtrial hearing on the subject of the juror's impartiality. See *post*, at 126 (STEVENS, J., concurring in judgment). Had the State raised the underlying constitutional right as an issue in the courts below and in the petition for certiorari, this approach might merit consideration. But the case came to us alleging harmless violations of the right to be present during all critical stages of the proceedings and the right to be represented by counsel, and we therefore analyze only that challenge. These rights, as with most constitutional rights, are subject to harmless-error analysis, see, *e. g., United States* v. *Morrison*, 449 U. S. 361, 364–365 (1981) (right to counsel); *Snyder* v. *Massachusetts*, 291 U. S. 97, 114–118 (1934) (right to presence), unless the deprivation, by its very nature, cannot be harmless. See, *e. g., Gideon* v. *Wainright*, 372 U. S. 335 (1963).

courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.[3]

This is not to say that *ex parte* communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications. When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties.[4] The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its abil-

---

[3] Thus, we have refused, on facts more troublesome than these, to find inherent bias in a verdict when a state trial court determined "beyond a reasonable doubt" that a juror's out-of-court action did not influence the verdict. In *Smith* v. *Phillips*, 455 U. S. 209 (1982), a criminal defendant contended that he had been denied due process because, during his state-court trial, one of the jurors applied to the prosecutor's office for a job as an investigator. The application was not brought to the parties' attention until sometime after the verdict was rendered. The state court held a post-trial hearing and, relying on the juror's own testimony, found "beyond a reasonable doubt" that the juror's action had not influenced the verdict. We concluded that, in the circumstances of that case, it would not be proper to impute bias in the verdict or to find a post-trial hearing inadequate as a remedy for the alleged due process violation. *Id.*, at 219. The facts here involve no inference of juror misconduct or third-party influence, and therefore are of far less concern than the conduct at issue in *Smith*. See *infra*, at 120–121. Thus, a post-trial hearing is adequate to discover whether respondent was prejudiced by the undisclosed communications about juror Fagan's recollection.

[4] See, *e. g.*, *Rogers* v. *United States*, 422 U. S. 35, 38–40 (1975) (although violation of Federal Rule of Criminal Procedure 43 may be harmless error, additional instructions from judge to jury, without notification to defendant or his counsel, is not); *Shields* v. *United States*, 273 U. S. 583, 588–589 (1927) (undisclosed instructions from judge to jury violate non-constitutionally based rules of orderly trial procedure); *Fillippon* v. *Albion Vein Slate Co.*, 250 U. S. 76, 81 (1919) (same).

ity to mitigate constitutional error, if any, that has occurred. See, *e. g.*, *United States* v. *Morrison, supra*, at 365; *Rogers* v. *United States, supra*, at 40. Post-trial hearings are adequately tailored to this task. See, *e. g.*, *Smith* v. *Phillips*, *supra*, at 218–219, and n. 8; *Remmer* v. *United States*, 347 U. S. 227, 230 (1954).

The final decision whether the alleged constitutional error was harmless is one of federal law. *Chapman* v. *California*, 386 U. S. 18, 20–21 (1967). Nevertheless, the factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. See 28 U. S. C. § 2254(d); *Sumner* v. *Mata*, 449 U. S. 539 (1981). The substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts. See *Marshall* v. *Lonberger*, 459 U. S. 422, 431–432 (1983). Here, both the State's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of "fact"—on a question the state courts were in a far better position than the federal courts to answer—deserves a "high measure of deference," *Sumner* v. *Mata*, 455 U. S. 591, 598 (1982), and may be set aside only if it "lack[s] even 'fair support' in the record." *Marshall* v. *Lonberger*, 459 U. S., at 432. The absence of a contemporaneous recording will rarely deprive the finding of "even 'fai[r] suppor[t]' in the record." See *ibid*.

The post-trial hearing in this case created more than adequate support for the conclusion that juror Fagan's presence on the jury did not prejudice respondent. The 1968 murder was not related to the crimes at issue in the trial. Pratt was not connected to any of the offenses for which respondent was convicted, and he did not testify at the trial. Juror Fagan never willfully concealed her association with the Santa Monica crime, and she repeatedly testified that, upon

recollection, the incident did not affect her impartiality.[5] She turned to the most natural source of information—the trial judge—to disclose the information she should have recalled but failed to recall during *voir dire*. Their *ex parte* communication was innocuous. They did not discuss any fact in controversy or any law applicable to the case. The judge simply assured her that there was no cause for concern. Thus, the state courts had convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication of juror Fagan's recollection. The lower federal courts should have deferred to this presumptively correct state-court finding and therefore should have found the alleged constitutional error harmless beyond a reasonable doubt.[6]

---

[5] A juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide and whether extraneous prejudicial information was improperly brought to the juror's attention. See Fed. Rule Evid. 606(b); *Smith* v. *Phillips, supra,* at 217, and n. 7, 218–219, and n. 8. But a juror generally cannot testify about the mental process by which the verdict was arrived. See *Mattox* v. *United States,* 146 U. S. 140 (1892). Thus, the California Court of Appeal refused to consider certain testimony in arriving at its decision that respondent had not suffered prejudice "beyond a reasonable doubt." App. C. to Pet. for Cert. 33. The District Court improperly refused to defer to the California Court of Appeal's sensitive review of this evidence. See 543 F. Supp. 757, 773–774 (ND Cal. 1982).

[6] Although JUSTICE MARSHALL's dissent purportedly agrees that the District Court was obliged to defer to the California Court of Appeal's finding that the jury's deliberations were not biased if that finding had "even 'fair support' in the record," *post,* at 143, its critique of the circumstances underlying that finding proves otherwise. The dissent concedes, albeit grudgingly, that each circumstance the California Court of Appeal relied on in concluding "beyond a reasonable doubt" that the jury's impartiality was not impaired was probative. See *post,* at 143–148. But the dissent, like the District Court below, argues that each circumstance is defective either because it depends on the juror's own statements concerning her impartiality or because "the potential for impairment of the jury's impartiality [in each] was considerable." See *post,* at 148. Thus, the dissent, like the District Court, bases its conclusion not on a "lack of even fair sup-

Accordingly, we grant the motion of respondent for leave to proceed *in forma pauperis* and the petition for certiorari, vacate the judgment of the Court of Appeals, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN dissents from this summary disposition. He would grant the petition for certiorari and set the case for oral argument.

JUSTICE STEVENS, concurring in the judgment.

Respondent was convicted of several serious offenses in a state trial during which the trial judge learned of a basis for challenging the impartiality of a juror from *ex parte*, unrecorded conversations with the juror; the judge did not *sua sponte* inform the parties of the occurrence or the substance of the conversations. Respondent contended, and the courts below held, that he was thereby deprived of liberty without due process of law and entitled to a writ of habeas corpus. Assuming that the respondent was deprived of his right to be present during a critical stage of his trial and his right to

---

port in the record" but on its own evaluation of the credibility of the witnesses, see, *e. g.*, *post*, at 145, n. 29, and a concern about the potential for prejudice in the underlying circumstances.

Such an approach plainly fails to adhere to the commands of the applicable statute. Title 28 U. S. C. § 2254(d) provides that the state courts' determinations about witness credibility and inferences to be drawn from the testimony were binding on the District Court and are binding on us. See *Marshall* v. *Lonberger*, 459 U. S. 422, 434 (1983). Title 28 U. S. C. § 2254(d) requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. It must conclude that the findings "lac[k] even 'fair support' in the record." 459 U. S., at 432. That statutory test is satisfied by the existence of probative evidence underlying the California Court of Appeal's conclusion that the jury's impartiality was unimpaired "beyond a reasonable doubt." *Ibid.* Thus, our holding necessarily follows from the state courts' findings of fact and from the presumption of correctness accorded to those findings.

effective assistance of counsel, the Court vacates on the ground that the state court's conclusion that the juror was impartial has fair support in the record and hence the constitutional deprivations were harmless beyond a reasonable doubt.

Most of my colleagues "emphatically disagree"[1] with the suggestion that a simple test can be used to determine whether an *ex parte* communication between a trial judge and a juror makes a subsequent jury verdict constitutionally infirm. Nevertheless, I believe both the majority and the dissents gloss over the serious legal issues presented by this case.

The majority concludes that the lower federal courts had a duty to find the alleged constitutional error harmless beyond a doubt because of the state-court conclusion that the jury was impartial. *Ante*, at 121. JUSTICE MARSHALL has persuasively shown, however, that there is a reasonable doubt concerning juror Fagan's impartiality. That doubt forecloses reliance on the harmless error standard enunciated in *Chapman* v. *California*, 386 U. S. 18 (1967),[2] but that doubt does not require that this petition for a writ of habeas corpus be granted.

In order to evaluate the significance of an alleged constitutional deprivation, it is essential that it first be correctly

---

[1] Compare:

"The Court of Appeals for the Ninth Circuit affirmed on the basis that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error.

"We emphatically disagree." *Ante*, at 117 (footnote omitted). with:

"To the extent that the majority means to imply that judges and jurors may freely engage in *ex parte* discussions of 'aspect[s] of the trial,' I emphatically disagree." *Post*, at 139, n. 19.

[2] As the Court has often stated, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman* v. *California*, 386 U. S., at 24.

identified.[3]   The alleged deprivation in this case has been characterized in three ways: (1) a denial of the defendant's right to be present at every critical stage of a criminal trial, (2) a denial of the right to effective assistance of counsel at trial, (3) a denial of the right to be tried by an impartial jury.[4]

---

[3]As I have previously explained, claims of constitutional error are not fungible.

"There are at least four types.   The most frequently encountered is a claim that attaches a constitutional label to a set of facts that does not disclose a violation of any constitutional right. . . . The second class includes constitutional violations that are not of sufficient import in a particular case to justify reversal even on direct appeal, when the evidence is still fresh and a fair retrial could be promptly conducted.   *Chapman* v. *California,* 386 U. S. 18, 22; *Harrington* v. *California,* 395 U. S. 250, 254.   A third category includes errors that are important enough to require reversal on direct appeal but do not reveal the kind of fundamental unfairness to the accused that will support a collateral attack on a final judgment.   See, *e. g., Stone* v. *Powell,* 428 U. S. 465.   The fourth category includes those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained."   *Rose* v. *Lundy,* 455 U. S. 509, 543–544 (1982) (STEVENS, J., dissenting).

In order to obtain habeas corpus relief from incarceration pursuant to a presumptively valid state-court judgment, a prisoner must persuade a federal court that the most serious kind of constitutional error infected the proceedings that led to his conviction.   "It is of the historical essence of habeas corpus that it lies to test proceedings so fundamentally lawless that imprisonment pursuant to them is not merely erroneous but void."   *Fay* v. *Noia,* 372 U. S. 391, 423 (1963).   Moreover, "the burden of showing essential unfairness [must] be sustained by him who claims such injustice and seeks to have the result set aside, and . . . it must be sustained not as a matter of speculation but as a demonstrable reality."   *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 281 (1942).

[4] The California Court of Appeal, the first court to confront respondent's claim that he had been deprived of liberty without due proces of law, stated that the issue before it arose "at the confluence of three streams of constitutional doctrine, flowing from the right of defendants in criminal proceedings to trial by an impartial jury, their right to be personally present during the proceedings, and their right to be represented by an attorney."   App. C to Pet. for Cert. 22–23.   Instead of analyzing the serious questions the case presents, however, the court merely assumed that "there was fed-

If respondent had established any of these deprivations, he would have sustained his burden of showing essential unfairness and would be entitled to the issuance of a writ of habeas corpus.

The question whether respondent was deprived of his right to be tried by an impartial jury is not before us, for respondent did not raise this claim in his habeas petition, choosing not to contend that juror Fagan was biased, either as a matter of law or as a matter of fact. 543 F. Supp. 757, 765 (ND Cal. 1982). The majority, however, passes on this question in concluding that the assumed deprivations of the fundamental constitutional rights to counsel and presence at trial were harmless error.

I think it quite clear that the mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every inter-

---

eral constitutional error committed as a consequence of the *in camera* conversations between Fagan and the trial judge in that neither [respondent] nor [his] counsel were present." *Id.*, at 23. The court then proceeded to determine whether this ill-defined "constitutional error" was harmless beyond a reasonable doubt. In doing so, the court essentially ignored the constitutional deprivation it had assumed, and instead concluded that Fagan's recollection of her friend's murder at the hands of a Black Panther did not deprive respondent of his right to an impartial jury. The only role played by the "constitutional error" in the court's analysis was that it allocated the burden of proof to the State to show "beyond a reasonable doubt" that the jury was not biased. The California Court of Appeal's unfortunate mode of analyzing this case is regrettably repeated in this Court.

I understand that the Court's approach to this case is largely a function of petitioners' apparent concession below that the *ex parte* communications established a constitutional violation. An apparent concession is all that it is, however, for petitioners' concession is so amorphous as to be meaningless and the parties actually argue the substance of the constitutional questions under the harmless error label. Indeed, the District Court recognized the illusory nature of petitioners' concession: it refused to assume the existence of a constitutional deprivation without substance or content and proceeded to determine for itself whether the facts disclosed violations of constitutionally secured rights. 543 F. Supp. 757, 765 (ND Cal. 1982).

action between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication. The fact that the judge learned of the potential bias of juror Fagan in an *ex parte* conversation with her is irrelevant in this case. There is no dispute concerning the content of those conversations; if the testimony about the conversations elicited at the post-trial hearing affords a basis for challenging the conviction, it affords a basis for answering those contentions as well. Moreover, to the extent that the claim of partiality is deemed to be before the Court, there is no contention that the post-trial hearing was inadequate to establish the historical facts relevant to assessing whether she was biased as a matter of law. In any event, there is of course no contention that whatever bias she harbored against the Black Panther Party and by inference against the respondent was the result of the conversations with the trial judge, nor is there any basis for suggesting that the conversations exacerbated whatever bias she harbored. Thus, the question in this case would be the same if the judge had learned of the potential bias of juror Fagan from an external source.[5]

If the trial judge's actions in this case consititute an error of constitutional dimension, it would have to be on the ground that respondent was denied his core due process right to notice and an opportunity to be heard in a meaningful manner and at a meaningful time by the trial judge's failure to notify the defense of a fact raising a question about a juror's partiality. In essence, respondent's claim is that he had a due process right to a midtrial hearing on the subject of Fagan's impartiality because of the option which existed at that point of replacing Fagan with an alternate. If such a right exists, the defendant would naturally have a right to be present at

---

[5] Indeed, the case would not be very different if defense counsel had learned of the potential bias in the course of the trial, and the trial judge denied a motion for a midtrial hearing on the question, but held a post-trial hearing.

the hearing and have the assistance of counsel at the hearing, but the existence of this right would not stem from the right to be present or the right to counsel. To argue that the right to counsel and presence is the source of the right to the midtrial hearing is to reason backwards. Naturally since respondent was denied the opportunity for such a hearing, he was denied the incidents of such a hearing, but that does not establish a violation of the incidental rights unless there was a predicate right to notice and a midtrial hearing.

While I believe that the trial judge should have promptly notified defense counsel of the substance of his conversations with juror Fagan, his error was not so fundamental as to render the conviction void. The trial judge made an error of judgment in failing to grasp the fact that Fagan's previously undisclosed knowledge would provide a basis for challenging her for cause on the grounds of imputed bias. Under the circumstances, that error was understandable, given that the nature of Fagan's expressed concerns to the judge did not explicitly raise a question of bias against any defendant and only through generalization raised a question of imputed bias against the Black Panther Party—Fagan's only concern was that she might lose her composure if the murder of her friend were explored in more detail—and that no evidence of respondent's membership in the Black Panther Party had at that point been introduced. While the good faith of the trial judge is not the question, the reasonableness of his actions under the circumstances is plainly relevant to determining whether they were so fundamentally unfair that they rendered the verdict a nullity. Moreover, respondent was provided with a full and fair opportunity to discover the information about the murder of Fagan's friend. Three months were devoted to jury selection, and while counsel's brief, general questions to juror Fagan about her "knowledge" about "crimes [of] violence" as a "witness, victim, [or] otherwise," and whether she "associate[d] the Black Panther Party with any form of violence in [her] own mind," App. C

to Pet. for Cert. 16, failed to elicit her later revealed knowledge of the murder of her friend, that failure was not a consequence of any shortcoming of the mechanism the State made available for uncovering that information. Finally, the defense ultimately did discover the information, apparently because of the effective assistance of his counsel, and discovered it in time for a meaningful hearing to be held in which the substance of the *ex parte* conversations and the extent of Fagan's knowledge of potentially prejudicial information could be established. In light of these factors, I conclude that respondent failed to sustain his burden of demonstrating a deprivation of a right so essential to the integrity of the process by which his conviction was obtained that it renders void the presumptively valid judgment.[6]

By failing to analyze the real procedural due process question which this case presents, and instead casually assuming the deprivation of the right to counsel and the right to presence—the labels the parties find apt to decribe the essential question—the majority endorses the application of a harmless error analysis to actual deprivations of these rights. Some constitutional rights, however, are so basic to a fair trial that their infraction can never be treated as harmless error. In my opinion the right to the effective assistance of counsel at trial is such a right.[7]

---

[6] If respondent had a fundamental due process right to notice of the substance of the communication between the judge and the juror and an opportunity for a hearing on the matter during midtrial, the reason for recognizing such a right would stem from the fact that juror bias questions are inherently speculative and that the meaningful time for a hearing on such questions is at a point in time when doubts about impartiality can be easily remedied by replacing the juror with an alternate. A deprivation of a right with such a rationale could not be held to be harmless error. See, *e. g., Chapman* v. *California,* 386 U. S. 18, 52, n. 7 (1967) ("[P]articular types of error have an effect which is so devastating or inherently indeterminate that as a matter of law they cannot reasonably be found harmless") (Harlan, J., dissenting). This, in substance, is what the lower courts held.

[7] *Chapman* v. *California,* 386 U. S., at 23, and n. 8; *id.,* at 42–44 (Stewart, J., concurring in result); *id.,* at 52, and n. 7 (Harlan, J., dissenting);

The Court's reasoning in applying the harmless error analysis must be that the purpose of affording the right to counsel in the circumstances of this case would be to guard against the risk of a biased jury, and hence if the jury was impartial, the risk never materialized and the deprivations were harmless.[8]  If that reasoning were generally applied, however,

see *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Glasser* v. *United States*, 315 U. S. 60, 76 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial"); *Johnson* v. *Zerbst*, 304 U. S. 458 (1938); *Powell* v. *Alabama*, 287 U. S. 45 (1932); see also *Cuyler* v. *Sullivan*, 446 U. S. 335, 349–350 (1980); *Geders* v. *United States*, 425 U. S. 80 (1976); *Herring* v. *New York*, 422 U. S. 853, 863 (1975).  The Court has permitted harmless error analysis regarding deprivations of the right to counsel at pretrial stages of criminal proceedings, *e. g.*, *Coleman* v. *Alabama*, 399 U. S. 1 (1970), but see *White* v. *Maryland*, 373 U. S. 59 (1963) *(per curiam)*, and naturally permits such analysis when the violation of the Sixth Amendment consists of the admission of evidence, since it is ordinarily possible to ascertain whether consideration of inadmissible evidence is harmless error, compare *United States* v. *Henry*, 447 U. S. 264, 274–275, n. 13 (1980), with *Massiah* v. *United States*, 377 U. S. 201 (1964); see also *Moore* v. *Illinois*, 434 U. S. 220 (1977).

In *United States* v. *Morrison*, 449 U. S. 361 (1981), we assumed that a pretrial unsuccessful attempt by Government agents to deprive a defendant of her right to effective assistance of counsel was a violation of the Sixth Amendment and held that dismissal of an indictment is not a proper remedy for that assumed violation.  *Morrison* is not a harmless error case.  The opinion did observe that even if the Government agents had managed to elicit incriminating information from the defendant, in violation of *Massiah* v. *United States, supra*, in their otherwise unsuccessful attempt to persuade her to cooperate and to discharge her attorney, her remedy for that violation would simply be to suppress the tainted evidence.  The erroneous admission of such evidence would be susceptible to a harmless error analysis, as the opinion indicated when it then noted in passing that "certain" violations of the right to counsel may be disregarded as harmless error, correctly citing *Moore* v. *Illinois, supra*, as identifying the types of violations which may be treated as harmless error—a limited exception to our conclusion in *Chapman*.  449 U. S., at 365.

[8] Whether application of this analysis is appropriate with respect to the purported right-to-presence violation is largely a question of semantics.  The right to be present at trial is rooted in the Confrontation Clause.  *Illinois* v. *Allen*, 397 U. S. 337, 338 (1970).  If a defendant were denied ac-

any deprivation of the right to counsel at trial, perhaps short of totally denying any assistance whatsoever, could be deemed harmless error. Fidelity to the Sixth Amendment and to precedent demands that such reasoning be rejected.

Finally, the majority concludes that Fagan's presence on the jury did not prejudice respondent, casually attaching the "beyond a reasonable doubt" label to the conclusion made obligatory by the presumed constitutional violations. I find it extraordinary that the majority is prepared to hold in essence that juror Fagan was impartial beyond a reasonable doubt.[9] The undisputed facts concerning the murder of her friend may not have rendered her biased as a matter of law—

---

cess to the courtroom while the prosecutor was examining his accusers, the constitutional error would taint the verdict no matter how firmly we might be convinced that the defendant's absence did not affect the outcome of the trial. See *Snyder* v. *Massachusetts*, 291 U. S. 97, 116 (1934) ("[C]onstitutional privileges or immunities may be conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial"). Even so, a very brief absence might be held to be a *de minimis* violation and afford no basis for relief. *Ibid.* Moreover, we have viewed a potential for prejudice as a necessary element of a violation of the right to be present. Thus, while a core Confrontation Clause violation might not be deemed harmless error, the more general right to presence may be inherently susceptible to a harmless error analysis. *Id.*, at 114–118.

[9] The majority uses the phrase the jury's deliberations "as a whole" were not biased. *Ante,* at 120, 121. Unless one can say beyond a reasonable doubt that juror Fagan's deliberations were not improperly influenced by her knowledge of the murder of her friend at the hands of a Black Panther, I fail to see how one can conclude that the jury's deliberations "as a whole" were not biased. Hence, I fail to see the point in not focusing on Fagan in this analysis. Respondent has never made any serious effort at establishing that the other jurors' knowledge of the murder of Fagan's friend directly influenced their thoughts about the case. I cannot believe that the majority means to imply that an additional showing of prejudice is required after one of the jurors is established to be prejudiced. Surely, a defendant has a right to impartiality on the part of all of the jurors, and a violation of that right is plainly not susceptible to a harmless error analysis. See *Tumey* v. *Ohio*, 273 U. S. 510 (1927).

a question which we need not decide—but they surely establish a reasonable doubt concerning her impartiality, and the presumptively correct findings of the state courts that she was not biased as a matter of fact erase neither the doubt nor the reasonableness of it.

In summary, although I agree that respondent has not carried his burden of establishing that his trial was fundamentally unfair, I cannot subscribe to the Court's assumption that a violation of the right to the assistance of counsel at trial, if established by the record, could be characterized as harmless beyond a reasonable doubt. Nor can I subscribe to the Court's analysis of the harmless error conundrum of its own making. I therefore concur in the judgment but do not join the Court's opinion.

JUSTICE MARSHALL, dissenting.

Without the benefit of briefing or oral argument, the Court today vacates the judgment of the Court of Appeals for the Ninth Circuit, affirming the decision of the District Court to issue a writ of habeas corpus. Because I believe that the rulings below were correct, and because I believe that important constitutional questions deserve more careful consideration than they have been accorded in this case, I dissent.

I

In 1971, George Jackson, a leader of the Black Panther Party, along with several other prisoners attempted to escape from San Quentin Prison. The plot was detected, and, in the course of the ensuing melee, Jackson, two other prisoners and three prison guards were killed. Respondent and five codefendants, all of whom allegedly were involved in the plan, were tried in a California court on charges of murder, conspiracy, and assault. One of the principal disputed issues in the case was the degree to which Jackson and the defendants had been assisted by members of the Black Panther Party "on the outside" in planning and executing the escape

attempt.   In an effort to assemble a jury capable of assessing impartially this and other controversial questions, the trial judge and defense counsel during *voir dire* questioned prospective jurors regarding their attitudes toward the Black Panthers and toward violent crimes in general.   One of the members of the venire, Patricia Fagan, testified that she did not associate the Black Panthers with violence and that she did not have any personal knowledge of violent crime; Fagan was subsequently accepted as a juror.

After 13 months of trial, the defense called as a witness one Louis Tackwood, who testified that various law enforcement officers had plotted to encourage Jackson to escape.   Allegedly, the police hoped to induce a group of Black Panthers to try to rescue Jackson, whereupon the police would ambush and kill the conspirators.   Tackwood testified that Elmer "Geronimo" Pratt was to be the leader of the rescue group, but that Pratt was also acting as a police informant.   In an effort to impeach Tackwood's testimony, the prosecution introduced evidence that, during the time in question, Pratt was incarcerated for a 1968 murder.   Upon hearing this testimony, juror Fagan remembered that Carolyn Olson, one of her childhood friends,[1] had been brutally murdered by mem-

---

[1] Fagan's subsequent descriptions of the intimacy of her relationship with Olson varied somewhat.   The California Court of Appeal resolved those discrepancies as follows: "Patricia Fagan had from the age of six or seven been a 'good,' 'close,' but not 'best' friend of Carolyn Olson. . . . Fagan cared for Olson's daughter on a daily basis while Olson was attending U. C. L. A. in about 1962.   At this time, the two women rarely visited socially.   Fagan knew Olson's husband."   *People* v. *Spain*, No. 1/Crim. 16126 (Cal. App. July 24, 1980), reprinted in App. C to Pet. for Cert. 14–15 (hereafter App. C).   In the absence of "convincing evidence" to the contrary, the foregoing findings—as well as all other findings by the state trial court and state appellate court that pertain to matters of historical fact— were binding on the District Court and are binding on us.   *Marshall* v. *Lonberger*, 459 U. S. 422, 432–435 (1983); *Sumner* v. *Mata*, 455 U. S. 591, 592–593 (1982) *(per curiam)*.

bers of the Black Panther Party.[2]   Fagan feared that the 1968 murder that had just been discussed by the prosecutor was that of her friend.

Fagan went to the trial judge's chambers and informed him of her suspicions.   She told the judge that she might cry if Pratt's prior crime were mentioned again in the courtroom. The judge indicated that it was unlikely that Pratt was her friend's murderer.   The judge asked Fagan whether her deliberations would be affected by what she had learned, and that Fagan indicated that they would not.[3]   The judge then admonished her to put the matter out of her mind.

That evening, Fagan called her mother and ascertained that Pratt was indeed the person who had been convicted of killing Carolyn Olson.   The next morning, Fagan again went to the trial judge's chambers: told him of her findings, and reiterated her fear that she would break down if the 1968 murder were discussed in court.   As the judge later described their ensuing conversation: "I told her I didn't see how that was significant, but did she feel it would have any effect on her disposition towards the case.   She said that she did not accept that, she felt that if Mr. Pratt were called to testify, that she would be very unsettled by that."[4]   As Fagan subsequently recollected the meeting, the judge then assured

---

[2] "The circumstances of the killing, as known to [Fagan], were that Olson and her husband were playing tennis when two people demanded their money, ordered them to lie down, and shot them." *People* v. *Spain*, App. C, at 15; see also Tr. of Postconviction Hearing 23958 (Tr.).

[3] Neither the judge's preliminary account of this first meeting, nor Fagan's first postconviction description of the encounter indicated that Fagan's ability to remain impartial had been discussed.   In their subsequent accounts, however, both parties maintained that the judge had questioned Fagan on this point and Fagan had indicated that her deliberations would be unaffected.   The state appellate court credited Fagan's and the judge's later testimony, see *People* v. *Spain*, App. C, at 19–20, and the District Court was bound by the state court's assessment of the conflicting evidence, see n. 1, *supra.*

[4] Tr. 23920.

her that the lawyers probably would not delve further into the matter of Pratt's prior crime, to which she responded "something to the effect, 'O.K., no problem, then,' meaning that the information regarding Pratt and my friend would have no adverse effect on me, and played no part in my evaluation of this case."[5]

The judge made no record of either of his conversations with Fagan and did not inform respondent, defense counsel, or the prosecutor of what Fagan had told him. Sometime later, Fagan "mention[ed] to other jurors that Pratt [had been] convicted of the murder of a friend," but, "to the best of [her] recollection," the subject was never again discussed among the jurors.[6]

Three aspects of the subsequent development of the trial are germane to the matters discussed by Fagan and the judge. First, on the Monday following the two *ex parte* meetings, a witness identified Pratt as "the leader of the Panthers in Los Angeles." Second, only after the meetings in question did the defense introduce evidence of respondent's membership in the Black Panther Party. Leaders of the party were called as witnesses, one of whom testified as to her association with respondent. Finally, in his closing argument, the prosecutor argued that "the Black Panther Party had helped to smuggle weapons or ammunition to Jackson and implied that [respondent's] party membership was evidence that he, too, was 'involved in' the escape plan and 'working with' Jackson."[7]

After 24 days of deliberation, the jury acquitted three of the six defendants on all counts. Two of the remaining defendants were convicted of assault. Respondent, the only defendant who was a member of the Black Panther Party,

---

[5] Affidavit of Patricia Fagan, Sept. 27, 1976, District Court Record 5481–5482 (R.); see also *People* v. *Spain*, App. C, at 19–20.

[6] R. 5482; see also *People* v. *Spain*, App. C, at 21.

[7] *Id.*, at 10.

was convicted of two counts of murder and of conspiracy to escape.[8]   Respondent was sentenced to life imprisonment.

After the trial, respondent's counsel was told by a third party about Fagan's *ex parte* contacts with the trial judge. Respondent's counsel went to Fagan's home and interviewed her regarding the nature of her discussions with the judge. On the basis of what he learned from that conversation, respondent's counsel moved for a new trial.   The judge conducted a hearing on respondent's motion.   After giving his own account of the two meetings and discussing the incidents with counsel, the judge called Fagan as a witness.   At the outset of the examination of Fagan, the judge told her that "it has been suggested that there is a potential that your testimony may disclose a violation of your oath of office as a juror in the case, and if that were to be true, you would potentially face possible criminal prosecution arising out of that."[9]   The judge informed Fagan that she had a right not to incriminate herself and a right to have a lawyer present to advise her during questioning.[10]   Fagan then formally waived her right to an attorney,[11] and the hearing proceeded.

In the course of the examination, respondent's attorney at several points asked Fagan questions that related to the effect upon her deliberations in the case of her knowledge that her childhood friend had been murdered by a member of

---

[8] Respondent's conviction on the two counts of murder was based upon a theory of vicarious liability.   It was not alleged that respondent himself killed anyone; rather, the prosecution argued that respondent had joined a conspiracy between Jackson and one Bingham to escape and that the murders were probable consequences of that conspiracy.   All of respondent's convictions thus turned upon the strength of his association with Jackson, and it was that association that the prosecutor sought to establish by stressing respondent's and Jackson's common membership in the Black Panther Party.

[9] Tr. 23944.

[10] *Id.*, at 23944–23945.

[11] *Id.*, at 23945.

the Black Panther Party. At each point, the prosecutor successfully objected to the question on the ground that inquiry into the mental processes by which a juror reached a verdict is proscribed by Cal. Evid. Code Ann. § 1150(a) (West 1966).[12] Fagan's testimony accordingly was limited to an account of what occurred in her meetings with the judge and to what she had known, believed, or felt at various points in the trial.[13] None of the other jurors testified at the hearing.

---

[12] Section 1150(a) provides:

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

The distinction drawn by the California rules between evidence of facts bearing upon the existence of any extraneous influence on the jury's deliberations and evidence of the mental processes by which the jury reached a result is consistent with that drawn in most other jurisdictions. See, e. g., *Mattox* v. *United States*, 146 U. S. 140, 149 (1892).

[13] The majority states that, at the postconviction hearing, "Fagan testified that . . . her subsequent recollection [of her friend's death] did not affect her ability impartially to judge respondent's innocence or guilt." *Ante*, at 116. Later, the majority makes much of the fact that Fagan "repeatedly testified that, upon recollection, the incident did not affect her impartiality." *Ante*, at 120–121. No such testimony can be found in the transcript of the postconviction hearing. The prosecutor and trial judge took care to prevent Fagan from answering any questions that pertained to the reasoning or motivations that induced her to conclude that respondent was guilty. See, e. g., Tr. 23965–23971. Indeed, Fagan did not even testify as to what she had told the judge during their *ex parte* meetings concerning the effect of her recollection upon her disposition toward the case. The only testimony at the hearing that pertained to their discussion of her impartiality was provided by the trial judge. His account of their conversations indicated (at most) that Fagan had assured him that she *would* remain impartial when it came time to render a verdict. See *id.*, at 23919–23920. The judge's description of what Fagan said during the meetings is corroborated by the affidavit that Fagan submitted to the trial

On the basis of Fagan's testimony and of his own recollection of the events at issue, the trial judge ruled that respondent had failed to demonstrate that he was prejudiced by the *ex parte* contacts[14] and accordingly denied respondent's motion for a new trial. The California Court of Appeal, in a divided opinion, affirmed on the ground that, although the secret contacts between Fagan and the trial judge gave rise to federal constitutional error,[15] the error was harmless. The California Supreme Court denied review.

Respondent then petitioned the District Court for a writ of habeas corpus. 543 F. Supp. 757 (ND Cal. 1982). On the basis of a thorough and thoughtful analysis of the questions presented, the court issued the writ. The District Court agreed with the California appellate court that respondent's constitutional rights to be present at critical stages of his trial and to be represented by counsel were violated by the conduct of the trial judge. The District Court then ruled, in the alternative, that the judge's failure to make any record of his conversations with Fagan precluded application of the harmless-error standard of review and that the State had failed to establish that the error in question was harmless beyond a reasonable doubt.[16] In a brief memorandum opinion, the Court of Appeals for the Ninth Circuit affirmed. Judg-

---

court, see *supra,* at 133–134, and n. 5. But nothing in the record indicates whether Fagan was able to keep her promise that she would remain unbiased.

[14] The District Court accurately characterized the state trial judge's finding as an "implicit" conclusion that any error was harmless. See 543 F. Supp. 757, 771 (ND Cal. 1982), affirmance order, 701 F. 2d 186 (CA9 1983).

[15] The Court of Appeal's opinion is somewhat ambiguous on this issue. At one point the court suggested that it was simply assuming for the sake of argument that respondent had demonstrated federal constitutional error. See *People* v. *Spain,* App. C, at 23. At other points, the court seemed to vouch for the proposition that constitutional error had been shown. See *id.,* at 23, n. 4, and 26–27. In any event, the District Court was obliged to determine this issue *de novo.*

[16] 543 F. Supp., at 768–777.

ment order reported at 701 F. 2d 186 (1983). The court reasoned that "[i]n this case the district court correctly concluded that the condition of the record made it impossible to apply intelligently the harmless error test." [17]

## II

The California Court of Appeal aptly observed that the issue in this case "arises at the confluence of three streams of constitutional doctrine, flowing from the right of defendants in criminal proceedings to trial by an impartial jury, their right to be personally present during the proceedings, and their right to be represented by an attorney." [18]

The existence and importance of the three constitutional rights mentioned by the Court of Appeal are beyond dispute. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd*, 366 U. S. 717, 722 (1961); see also *Turner* v. *Louisiana*, 379 U. S. 466, 471–473 (1965). "It is now accepted . . . that an accused has a right to be present at all stages of the trial where his absence might frustrate the

---

[17] *Spain* v. *Rushen*, No. 82–4358 (CA9 Jan. 24, 1983), reprinted in App. A to Pet. for Cert. 5. The majority characterizes the holding of the Court of Appeals as a ruling that "an unrecorded *ex parte* communication between trial judge and juror can never be harmless error." *Ante*, at 117. Though the Court of Appeals' decision is not altogether clear on this point, its reference to "this case" strongly suggests that it intended to rule only that, on the facts of the controversy before it, the potential for harm to respondent entailed by the secret meetings between Fagan and the trial judge was so great that something more than a postconviction hearing five months after the incidents in question was necessary to establish that the constitutional error was harmless. If the majority is truly concerned lest the Court of Appeals' memorandum opinion be read more broadly, the proper disposition of the case would be to remand it with instructions to the Court of Appeals to clarify the basis of its decision, not summarily to vacate the decision on the ground that "[t]he lower federal courts should have . . . found the alleged constitutional error harmless beyond a reasonable doubt." *Ante*, at 121.

[18] *People* v. *Spain*, App. C, at 22–23.

fairness of the proceedings, *Snyder* v. *Massachusetts*, 291 U. S. 97 [1934]." *Faretta* v. *California*, 422 U. S. 806, 819, n. 15 (1975). "The Sixth Amendment provides that an accused shall enjoy the right 'to have the Assistance of Counsel for his defense.' This right, fundamental to our system of justice, is meant to assure fairness in the adversary criminal process. Our cases have accordingly been responsive to proved claims that governmental conduct has rendered counsel's assistance to the defendant ineffective." *United States* v. *Morrison*, 449 U. S. 361, 364 (1981) (citations omitted); see also *Herring* v. *New York*, 422 U. S. 853, 857 (1975) (acknowledging the applicability of these principles to state criminal proceedings).

What links these three doctrines in the instant case is that the adversary process ceases to work effectively when neither the defendant nor his attorney is informed of an event that may significantly affect the ability of a member of the jury impartially to weigh the evidence presented to him.[19] Deprived of such information, the defendant and his counsel are unable to take measures either to ascertain whether the juror is indeed prejudiced (and, if so, to request his replacement by an alternate) or to organize the presentation of their case so as to offset or mitigate the juror's potential bias. It

[19] The majority relies upon an assumption that "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Ante*, at 118. Whatever one thinks of the accuracy of the majority's generalization regarding the frequency of contacts between judges and jurors, it has little to do with this case. At issue here is a pair of *ex parte* meetings between a trial judge and a juror in which the juror revealed to the judge facts that impinged significantly upon the juror's impartiality—*i. e.*, that bore upon the juror's ability fairly to assess the defendant's guilt or innocence. The question whether the judge had a constitutional obligation to tell the defendant or his lawyer what the juror had told him should not depend upon how often jurors approach judges to talk about matters of "personal comfort." To the extent that the majority means to imply that judges and jurors may freely engage in *ex parte* discussions of "aspect[s] of the trial," I emphatically disagree.

matters little whether one characterizes the resultant injury to the defendant as a deprivation of the right to counsel, a violation of the "right to be present," or an abridgment of the right to an impartial jury. The essence of the situation is that, when information that bears upon the ability of a juror to remain "indifferent" is withheld from the defendant and his counsel, the machine on which we rely to ensure that the defendant is not deprived of his liberty without due process of law breaks down.

It is undeniable that the information withheld from respondent bore significantly upon the ability of at least one juror to remain impartial. In her meetings with the trial judge, Fagan acknowledged that, in midtrial, she had remembered that a childhood friend had been murdered by a leader of an organization to which respondent belonged and other members of which were alleged to have conspired to commit the crime for which respondent was accused. Fagan further admitted that her recollection of her friend's murder was sufficiently poignant that she was liable to break down if the event were mentioned again in the courtroom. The potential impact upon Fagan's impartiality of her recently revived memories was enormous.[20] Preservation of the pro-

---

[20] The severity of the risk that Fagan would be unable impartially to assess the evidence presented to her—a risk that should have been apparent to the trial judge even at midtrial—distinguishes this case from *Smith* v. *Phillips*, 455 U. S. 209 (1982). Contrary to the suggestion of the majority, *ante*, at 119, n. 3, the facts of this case are significantly more "troublesome" than those of *Smith*. In *Smith*, the defendant and his counsel learned at *voir dire* that the juror in question hoped to pursue a career in law enforcement; defense counsel was nevertheless able to satisfy himself that the juror was unbiased and should be seated. At no point did the juror act in a way suggesting that his emotional outlook on the case was different from the outlook with which he began. Moreover, there was no direct link in *Smith* between the nature of the bias to which the juror was vulnerable and the substance of the contested issues in the case. By contrast, in the instant case, Fagan's revived memories were flatly inconsistent with her testimony at *voir dire*, Fagan clearly indicated to the judge the degree to which she was "unsettled" by her recollections, and the na-

cedural protections inherent in the adversary system made it essential that respondent or his lawyer be informed of the circumstances that had come to the judge's attention. The judge's failure to so inform respondent or his counsel was constitutional error.

## III

The conclusion that respondent's federal constitutional rights were violated does not dispose of this case. As all of the courts below recognized, respondent is not entitled to relief if it can be determined beyond a reasonable doubt that respondent suffered no harm as a result of the abridgment of his rights. *Chapman* v. *California*, 386 U. S. 18 (1967). As the District Court pointed out, two kinds of possible injuries must be assessed in applying the harmless-error standard to the facts of this case: injury to respondent resulting from the bias of one or more jurors and injury resulting from respondent's loss of opportunity to correct, mitigate, or adjust to an alteration in the perspective of one or more jurors.

## A

The first of these possible injuries was considered by the state courts. As the majority observes, the California Court of Appeal held that the prosecution had carried its burden to show, beyond a reasonable doubt, that "Fagan was not bi-

---

ture of the potential prejudice to which she was exposed bore directly upon one of the principal disputed issues in the trial—namely, the existence and scope of a conspiracy among various members of the Black Panther Party inside and outside the prison to engineer Jackson's escape.

*Smith* is readily distinguishable on other grounds as well: In contrast to this case, the trial judge in *Smith* did not learn of the circumstances that threatened the impartiality of the juror until after the defendant had been convicted. Again in contrast to this case, the defendant and his counsel in *Smith* were not denied access to any meetings between the trial judge and a juror. Thus, two of the constitutional rights implicated in this case—the right to the assistance of counsel and the right to be present at critical stages of the trial, see *supra*, at 138–140—were not at issue in *Smith*. For an additional distinction between the two cases, see n. 23, *infra*.

ased or prejudiced."[21]  The majority argues that "[t]his find-
ing of 'fact'—on a question the state courts were in a far
better position than the federal courts to answer—deserves
a 'high measure of deference,' and may be set aside only if
it 'lack[s] even "fair support" in the record.'" *Ante*, at 120
(citation omitted).

I assume, for the sake of argument, that the majority is
correct in implying that the question whether a juror was
biased is a matter of historical fact, rather than a mixed ques-
tion of law and fact.[22]  I therefore proceed on the assumption
that, if the Court of Appeal's finding that Fagan was not
biased was fairly supported by the record, the District Court
was obliged to defer to that finding. *Marshall* v. *Lonberger*,

---

[21] *People* v. *Spain*, App. C, at 28.

[22] There are good reasons to doubt the premise of the majority's opin-
ion—namely, that a determination, based solely on inferences drawn from
objective circumstances, that a juror was not biased is no different from
any other factual determination for the purpose of applying the standard of
review embodied in 28 U. S. C. § 2254(d).  As the California Court of Ap-
peal acknowledged when it phrased its finding as a ruling that, "beyond a
reasonable doubt," Fagan was not prejudiced, the determination of this
question is tantamount to a determination of the ultimate question whether
the constitutional error was harmless, which is pre-eminently a matter of
federal law, see *Chapman* v. *California*, 386 U. S. 18 (1967).  If federal
courts are obliged to defer to state-court findings of this order, the capacity
of the federal courts through habeas proceedings to remedy deprivations of
constitutional rights in state criminal trials will be substantially undercut.
Sensitivity to these problems perhaps explains the majority's decision to
place in quotation marks its description of a determination of jury bias as a
question of "fact."  *Ante*, at 120; see also *Smith* v. *Phillips, supra*, at 222,
and n. (O'CONNOR, J., concurring) (In certain "exceptional situations," in
which objective circumstances cast considerable doubt on the impartiality
of a juror, the federal courts may be obliged to apply a doctrine of "implied
bias" and, in so doing, "need not be deterred by 28 U. S. C. § 2254(d)").

The status under § 2254(d) of a state court's ruling regarding a juror's
impartiality is precisely the kind of complex and important federal question
that merits plenary consideration by this Court.  Insofar as that question
is critical to the outcome of this case, it is irresponsible in my view for the
majority to attempt to resolve the issue without even the benefit of brief-
ing by the parties.

459 U. S. 422, 432–435 (1983). However, for the reasons outlined by the District Court, it is clear that the state court's finding on this crucial issue does not have "even 'fair support' in the record."[23]

The California Court of Appeal expressly relied on three circumstances in concluding "beyond a reasonable doubt" that Fagan's impartiality was unimpaired. None can withstand scrutiny.

*First.* The Court of Appeal emphasized that "Pratt figures, at most, tangentially in the case."[24] It is true that the

---

[23] As the majority notes, the facts of this case bear some resemblance to those of *Smith* v. *Phillips*, and the majority relies upon the result reached in *Smith* to buttress its ruling that the District Court in the instant case should not have issued the writ of habeas corpus. *Ante*, at 118–119, and n. 3. I remain persuaded that the decision in *Smith* was incorrect. See *Smith* v. *Phillips*, 455 U. S., at 224 (MARSHALL, J., dissenting). It should be emphasized, however, that for two reasons *Smith* does not control this case. First, as indicated above, the potential impact in this case of events occurring in midtrial upon the impartiality of the jury is substantially greater than was true in *Smith*. See n. 20, *supra*. Second, the posture in which the question of jury bias arose in *Smith* is fundamentally different from the posture in which that issue is presented in this case. In *Smith*, the existence of a constitutional violation turned upon proof of actual impairment of the impartiality of the jury. The Court ruled that only if the defendant were able affirmatively to prove bias on the part of a juror could he establish a violation of due process. Concluding that the state court's determination that the defendant had not proved bias was supported by the record and therefore was not vulnerable to review by the District Court, the majority in *Smith* held that no "constitutional violation" had been established and that the writ should not have issued. 455 U. S., at 221. In this case, by contrast, a constitutional violation occurred when the trial judge failed to inform respondent, defense counsel, or the prosecutor of what had transpired during the judge's *ex parte* meetings with Fagan. See *supra*, at 138–141. Thus, the District Court was obliged to issue the writ unless the State could prove, beyond a reasonable doubt, that respondent had suffered no injury as a result of the judge's constitutional error. The language used by the Court in *Smith* to define the burden a criminal defendant must sustain in order to prove an abridgment of his constitutional right to an impartial jury thus has no relevance to this case.

[24] *People* v. *Spain*, App. C, at 24; see also *id.*, at 35.

testimony at trial pertaining to Pratt had little bearing on the question of respondent's guilt or innocence. But Pratt's participation in the escape attempt is not what is at stake in this appeal. The significance of the testimony pertaining to Pratt is that it triggered Fagan's memory that Carolyn Olson had been murdered by a Black Panther. The District Court accurately analyzed the potential for harm to respondent resulting from the rejuvenation of Fagan's recollection:

> "From [respondent's] perspective, the combination of Ms. Fagan's knowledge, its emotional impact on her, and the trial testimony concerning Elmer Pratt's leadership role in the Black Panther Party had potentially devastating implications. In a case concerning a violent series of events in which the Black Panther Party played a key role, . . . the defendant, though he did not know it, was being judged by a juror greatly distressed by memories of the violent death of her good friend at the hands of a person she knew to be a Black Panther Party member— a person shown by trial testimony to be a leader of that party. Extraordinary insight is not required to perceive the potential harm to [respondent] if Ms. Fagan's personal experience, rather than the evidence at trial, were permitted to determine jurors' assessments of [respondent's] guilt or innocence."[25]

For the reasons indicated by the District Court, the fact that Pratt himself did not figure prominently in the case provided no support for the state court's finding of "no bias."

*Second.* The Court of Appeal next pointed to "Fagan's disclaimers as to any effect that Pratt's murder of her friend might have on her consideration of the case."[26] In substantiating this reference, the Court of Appeal adverted to Fagan's testimony at three stages of the trial. First, "[a]t the voir dire, Fagan testified that she did not associate the Black Pan-

---

[25] 543 F. Supp., at 773.

[26] *People* v. *Spain*, App. C, at 35.

ther Party with 'any form of violence.'"[27]   Such testimony is clearly irrelevant to whether Fagan's recollection of the fact that Olson was killed by a Black Panther—a recollection inconsistent with her statement at *voir dire*—affected her impartiality.

Next, the Court of Appeal noted that, "[d]uring her conversation with the trial judge regarding Pratt, the court asked her if the Pratt killing of her friend would affect her disposition toward the case and she replied that it would not."[28]   As the District Court recognized, there are compelling reasons to discount the probative value of Fagan's representations to the trial judge concerning her ability to remain impartial.   Most importantly, her statements consist only of promises that, when it came time to deliberate on the case, she would not be affected by her recollection.[29]   Those promises were made before Fagan was exposed to testimony that Pratt was the leader of the Black Panther Party in Los Angeles and to extensive testimony pertaining to respondent's activities as a Party member, and before the prosecutor, in his closing argument, emphasized the common membership in the Party of Jackson, respondent, and their accomplices as evidence of their joint participation in the conspiracy to escape.   Finally, the record and the factual findings by the state court indicate only that Fagan, in her two meetings

---

[27] *Id.*, at 30–31.

[28] *Id.*, at 31–32.

[29] It is worth noting that Fagan had powerful reasons for wanting to believe that she would be able to remain impartial.   Her sudden recollection of the circumstances surrounding her friend's murder occurred 13 months into the trial.   Fagan was aware that her revived memory rendered untrue her responses at *voir dire* concerning her lack of personal knowledge of violence and her impression of the Black Panther Party.   Most likely, she felt guilty that she had not recalled earlier the fact that Olson had been murdered by a Black Panther, and feared that the result of her lapse would be the declaration of a mistrial and the loss of 13 months of work.   Under such conditions, it would have required extraordinary self-knowledge and courage for Fagan to tell the trial judge that she would not be able to examine impartially the evidence presented to her.

with the trial judge, made simple declarations (the precise content of which neither Fagan nor the judge remembers) concerning her unimpaired impartiality. The judge made no effort to test Fagan's assertions—to explore the basis for her confidence in her ability to look at the case through unjaundiced eyes. In sum, the statements made by Fagan in the two *ex parte* meetings provide little if any support for the finding of the Court of Appeal that Fagan's deliberations were unaffected by her knowledge of Olson's murder.

Finally, the Court of Appeal made some reference in its opinion to statements made by Fagan in the postconviction hearing regarding her impartiality. The court acknowledged, however, that the constraints imposed by Cal. Evid. Code Ann. § 1150(a) (West 1966) on the scope of the postconviction inquiry prevented Fagan from testifying that she had in fact remained impartial. Indeed, the Court of Appeal noted that the few statements made by Fagan that arguably bear upon her mental processes in reaching her verdict[30] "may well have been inadmissible," and the court accordingly declined to rely on them.[31] The only other relevant testimony made by Fagan in the hearing pertained to her state of mind at the time she met with the trial judge to discuss her revived recollection of her friend's murder.[32] That testimony

---

[30] Those statements pertained to Fagan's beliefs concerning such matters as the likelihood that a person who grew up in the Watts area would "black out" when confronted with violent crime and the probability that a criminal defendant who relies upon psychiatric testimony is guilty of the crime for which he is charged. See, *e. g.*, Tr. 23966, 23968.

[31] *People* v. *Spain*, App. C, at 33.

[32] See Tr. 23957, 23977–23978. At one point in its discussion, the Court of Appeal argued that, "at the motion for a new trial where all appellants and their counsel were present, she testified that she associated the Black Panther Party with 'worthwhile activities' such as a breakfast program for school children carried on by the party." *People* v. *Spain*, App. C, at 32. The court provides no citation for this statement, and no such statement appears in the transcript of Fagan's examination at the hearing. In the

is subject to the same infirmity as the state court's finding regarding what was in fact said at those meetings: it pertains at most to Fagan's disinterestedness at those moments and indicates nothing regarding her state of mind when it came time to render a verdict. The probative value of her statements at the hearing is further undercut by the fact that Fagan was aware that an admission that her impartiality had indeed been impaired might well subject her to criminal liability. In sum, as the Court of Appeal itself seems to have recognized, little if any support for a finding of lack of bias may be gleaned from Fagan's testimony at the postconviction hearing.

*Third.* The Court of Appeal noted, finally, that "[i]n addition, we rely on the objective results of the jury deliberations as demonstrating that the jury, as a whole, and Fagan, in particular, were unbiased."[33] The court reasoned that the duration of the jury deliberations indicated that "the jury carefully considered and evaluated the evidence, rather than by reason of bias or prejudice, engaged in a rush to verdict" and that the results of those deliberations—the acquittal on

---

affidavit she submitted to the trial court after the verdict, Fagan did make the following remark, to which the Court of Appeal may have been referring:

"My answers to [respondent's counsel's] questions [at *voir dire*] regarding the Black Panther Party . . . were and still are true and correct. My knowledge of the Black Panther Party was primarily limited to a breakfast program for school children conducted by that organization in the Los Angeles Area. Therefore, I associate the Black Panther Party with worthwhile activities." R. 5482.

It is clear from the context that the foregoing statement pertained principally to Fagan's honesty at *voir dire* (and was designed to protect her from criminal prosecution for violation of her oath of office). At most, the statement bears only tangentially on the issue of whether Fagan's recollection of her friend's murder affected her determination that respondent had joined with other members of the Black Panther Party in plotting the escape attempt.

[33] *People* v. *Spain*, App. C, at 33.

all counts of three of the defendants, the conviction only for assault of two of the remaining defendants, and respondent's acquittal of three counts of murder and one count of assault—indicated that the jury was impartial.[34]   The District Court's response to the foregoing line of argument is compelling:

> "Though the California Court of Appeal concluded that the fact that [respondent] was acquitted on some counts shows that the jury was not biased, . . . that very fact is subject to precisely the opposite inference.   [Respondent] was the only defendant who was a member of the Black Panther Party and the only defendant convicted of conspiracy and murder.   The only counts on which [respondent] was convicted were those with which he was connected, not by any direct participation in the acts of violence at San Quentin, but by his association and alleged conspiracy with George Jackson, also a Black Panther.   All of the other defendants were acquitted of the conspiracy counts and the related substantive crimes. This pattern of convictions and acquittals, viewed from the perspective of the dangers posed by Ms. Fagan's personal exposure and reaction to events linking the Black Panther Party to other violent crime, certainly raises a reasonable possibility that the information known by Ms. Fagan and communicated to other jurors influenced the verdicts."[35]

In conclusion, none of the three circumstances relied upon by the California Court of Appeal provides significant support for its finding that the impartiality of Fagan and the other jurors was unaffected by Fagan's recollection of her friend's murder.   By contrast, the potential for impairment of the jury's impartiality was considerable.   The murder case against respondent was founded on a theory of vicarious liability; respondent could be found guilty only if the jury de-

---

[34] Id., at 33–35.
[35] 543 F. Supp., at 776.

termined that he had joined an ongoing conspiracy to escape from the prison.  As the Court of Appeal acknowledged, the evidence pertaining to whether there had existed such a conspiracy was closely balanced.[36]  One of the facts tending to show the existence of the conspiracy was the common membership in the Black Panther Party of the alleged conspirators.  The risk that, in passing on this critical question, Fagan or the other jurors whom she told of her recollection would be affected by their knowledge that Fagan's childhood friend had been murdered by a Party leader was severe.  In view of the paucity of evidence of the absence of bias and the severity of the danger of bias, the District Court properly concluded that the state court's finding "beyond a reasonable doubt" that no bias existed is not fairly supported by the record.

## B

The second injury that respondent may have suffered as a result of the constitutional error committed by the trial judge is impairment of his ability to organize the presentation of his case to take into account the sensitivities of the jury.[37]  As the District Court recognized, had respondent or his counsel been told what occurred during the *ex parte* meetings, they might have acted in either of two ways (other than seeking Fagan's replacement by an alternate juror) to minimize the potential adverse impact on their case of Fagan's memory. First, they could have requested an instruction by the trial judge that Fagan not speak to the other jurors regarding the circumstances surrounding Olson's death.  Second, they might have decided not to present extensive evidence of respondent's prominent role in the Black Panther Party.

---

[36] *People* v. *Spain*, App. C, at 5.

[37] From this perspective, the trial judge's failure to tell defense counsel of the *ex parte* meetings with Fagan is analogous to an order by a trial judge that defense counsel may not conduct a survey of the community from which the venire is drawn to determine the prevailing attitudes of the residents to certain controversial issues that may arise during the trial. Surely such an order would be deemed prejudicial error.

Either of these requests might have affected the outcome of the case.

The state courts made no finding concerning the injury to respondent that might have resulted from the denial of the opportunity to take these steps. The District Court concluded that the absence of any pertinent evidence in the record makes it impossible to conclude, beyond a reasonable doubt, that respondent suffered no harm of the sort described. It cannot be said that the District Court erred in making that determination.

## IV

The District Court and Court of Appeals conscientiously applied the standard of review applicable to habeas corpus proceedings embodied in 28 U. S. C. § 2254(d). Examination of the papers that have been submitted to us reveals the conclusions reached by each of the federal judges who has considered this case to be manifestly correct. Nevertheless, without affording respondent the opportunity to brief the issues presented, the Court summarily vacates the judgment below.

I dissent.

JUSTICE BLACKMUN, dissenting.

I would deny certiorari in this case because I am not at all persuaded that the United States Court of Appeals for the Ninth Circuit was wrong in affirming the District Court's decision to issue a writ of habeas corpus, or that the case presents an issue worthy of plenary review. I therefore dissent.

As the discussion that this case has generated illustrates, it is not simply a situation where the federal habeas courts have disregarded the guidance provided by *Sumner* v. *Mata*, 449 U. S. 539 (1981), and *Smith* v. *Phillips*, 455 U. S. 209 (1982). Nor does it involve a question over which the lower courts are confused or that is likely to recur often.

The Court indicates that the Ninth Circuit "affirmed on the basis that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error," and with that proposition the Court "emphatically disagree[s]". *Ante,* at 117. While that interpretation of the Court of Appeals' opinion is possible, it certainly is not compelled. The entire discussion by the Court of Appeals on this issue is as follows:

> "The state court made no contemporary record of the *ex-parte* communication between judge and juror or even of the fact that it took place. In this case the district court correctly concluded that the condition of the record made it impossible to apply intelligently the harmless error test. *Chapman* v. *California,* 386 U. S. 18, 22 (1966). The court's explanation of its decision to grant the habeas writ referred to the inadequacy of the state's record and the need for extensive speculation in determining the extent of the error. See *Sumner,* 449 U. S. at 551. The harmless effect of conceded constitutional error cannot be established by speculation from a silent record." App. A to Pet. for Cert. 4–5.

The District Court had devoted what now provides 54 pages in the appendix to the petition for certiorari to a consideration whether the constitutional error assumed by the state courts could be determined to be harmless beyond a reasonable doubt in a post-trial hearing. The Ninth Circuit at that time had a rule that for certain constitutional errors, an after-the-fact determination of harmless error was impossible. The District Court concluded that the error here required automatic reversal. It then examined the record of the hearing and found its decision that no after-the-fact determination of harmlessness was possible reinforced by the paucity of evidence as to whether the juror, in fact, had been able to vote impartially. As I read those opinions, they indicate something far short of a determination that an

unrecorded *ex parte* communication between a trial judge and a juror can never be harmless error.

This Court has not yet held that a federal habeas court is barred by principles of federalism from carrying out its statutory duty under 28 U. S. C. § 2254(d) to determine whether the state court's factual determination is fairly supported by the record. In *Smith* v. *Phillips, supra,* the Court found a conclusive presumption of juror bias inappropriate because it was not impossible to determine in an after-the-fact hearing whether the juror had been biased. Nothing in the opinion in that case, however, foreclosed the possibility that a conclusive presumption of bias might be called for in special circumstances. The concurring opinion pointed out:

> "[I]n certain instances a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice. While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of 'no bias,' the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances." 455 U. S., at 222.

It added, in a footnote:

> "In the exceptional situations that may require application of an 'implied bias' doctrine, the lower federal courts need not be deterred by 28 U. S. C. § 2254(d), which provides that in a federal habeas proceeding 'a

determination after a hearing on the merits of a factual issue . . . shall be presumed to be correct.'" *Id.*, at 222, n.

Each of these examples no doubt refers to a situation in which the juror's connection with a participant in the trial is undisclosed. Nevertheless, it is at least a close question whether this case, where the juror's friend was killed by the defendant's organization, should be included in the "extreme situations" list. In addition, as JUSTICE MARSHALL points out, a conclusive presumption of bias in this case is further supported by the fact that the State had the burden of proving beyond a reasonable doubt that the defendant had suffered no injury from the admitted constitutional error.*

Inasmuch as the case primarily involves the application of settled law to a highly unusual set of facts, I continue to feel that plenary review of the case is unnecessary. Because the questions are close, and because a fair reading of the guidance this Court already has given suggests that the result the Ninth Circuit reached was correct, I am inclined to feel that the Court's summary "rap on the knuckles" disposition of the federal courts' efforts to perform their statutory and constitutional duties is not warranted.

---

*JUSTICE STEVENS suggests that the constitutional error here was mischaracterized as a deprivation of the right to counsel and to be present at critical stages of the trial, rather than as a denial of the right to be tried by an impartial jury. Even assuming that he is correct, the fact is, as the Court notes, see *ante,* at 117–118, n. 2, that petitioners have conceded and the courts below have assumed that respondent's constitutional rights to counsel and to be present at critical stages of the trial were violated. On the basis of that assumption, the dispute has centered on whether respondent was harmed by that error, in particular whether respondent was harmed by juror bias. In light of the framework in which the analysis has been cast, JUSTICE STEVENS' view that the question whether juror Fagan was biased has not been raised appears to me to be unnecessarily narrow.