UNITED STATES of America ex rel.
Keith EDDINGTON and Gary
Hart, Petitioners,

v.

Michael LANE, James Chrans, and
William Thieret, Respondents.

No. 84 C 3271.

United States District Court,
N.D. Illinois, E.D.

July 29, 1985.

Donna Finch, Asst. Appellate Defender, Chicago, Ill., for petitioners.

David Bindi, Asst. Atty. Gen., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Keith Eddington and Gary Hart ("Petitioners") petition for a writ of habeas corpus under 28 U.S.C. § 2254, contending that they are unlawfully in the custody of Michael Lane, the Director of the Illinois Department of Corrections; James A. Chrans, the Warden of the Pontiac Correctional Center where Eddington is incarcerated; and James H. Thieret, the Warden of Menard Correctional Center where Hart is incarcerated ("Respondents"). Presently before the court are the parties' cross-motions for summary judgment. Although we find that Petitioners were deprived of their Sixth Amendment rights by their jury's extrajudicial exposure to prejudicial information, for the reasons set forth be-

low, we narrowly conclude that the strength of the evidence against Petitioners renders the error harmless. Accordingly, Respondents' motion is granted and Petitioners' motion is denied.

## Background

Petitioners were convicted of kidnapping and unlawful restraint following a jury trial in the Circuit Court of Cook County in 1981, and were sentenced to twelve years incarceration. Petitioners motioned for a new trial upon learning that the jury had during the course of trial viewed a list of charges pending against Petitioners, posted outside the courtroom.

The trial court held a post trial hearing, at which one member of the jury testified that he and other jurors had seen the list while walking around the courthouse during a lunch break. The juror believed the list contained approximately fifteen charges including rape and deviate sexual offenses. He testified that these charges were a topic of discussion during jury deliberations, but that his decision was not affected by the knowledge that these charges were pending against Petitioners.

Because of its erroneous application of Illinois law prohibiting judicial consideration of jurors' mental processes in arriving at a verdict, the trial court concluded that it could not consider this testimony. The court denied Petitioners' motion for a new trial.

The Appellate Court of Illinois, after reviewing the record of the post-trial hearing, affirmed Petitioners' convictions. *People v. Eddington*, 117 Ill.App.3d 953, 73 Ill. Dec. 248, 453 N.E.2d 1383 (1st Dist.1983). The court did not make clear whether it found that the jurors' exposure to the list did not constitute constitutional error, or whether it found that constitutional error occurred but was harmless. The court based its affirmance primarily upon two factors. First, the jury was otherwise aware of at least some of Petitioners' criminal activity other than the crimes charged because of properly presented evidence concerning the circumstances of Petition-

ers' arrests. *Id.* 117 Ill.App.3d at 1388. Second, the trial court had instructed the jury that this evidence of Petitioners' involvement in an offense other than the offenses charged should be considered only for the limited purposes for which it had been received. *Id.*

The Supreme Court of Illinois denied Petitioners leave to appeal from the appellate court's decision. The parties agree that Petitioners have exhausted their state remedies, as required by 28 U.S.C. § 2254(b).

## Discussion

The issues raised by Petitioners are whether the exposure of the jury to the list of charges violated their right to confrontation under the Sixth Amendment and, if so, whether they are entitled to habeas relief. The threshold question we must address is the extent of deference we must extend to the decision of the Appellate Court of Illinois. The answer depends on whether that court decided a question of law, which we could review *de novo*, or a question of fact, which we could not review unless the fact-finding procedure was insufficient in certain respects specified by statute, 28 U.S.C. §§ 2254(d)(1)–(8).

The question of what events occurred with regard to the jury's witnessing of the list is undoubtedly factual, and, as we discuss *infra*, the state court fact-finding procedure was sufficient. The problematic issue here concerns Respondents' contention that the appellate court's conclusion derived from those facts, that either no constitutional error occurred or the error was harmless, is a finding of "historical fact" entitled to our deference. Respondents' position relies on the Supreme Court's *per curiam* decision in *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).

In *Rushen*, the Court reviewed a grant of a writ of habeas corpus where the state appellate court had found that an *ex parte* communication between the trial judge and one juror was unconstitutional but harmless error. In a confusing decision, the

Court on the one hand granted that "[t]he final decision whether the alleged constitutional error was harmless is one of federal law. *Chapman v. California,* 386 U.S. 18, 20–21 [87 S.Ct. 824, 826–827, 17 L.Ed.2d 705] ... (1967)." *Id.* 104 S.Ct. at 457. Decisions by state courts on questions of federal law are not, of course, entitled to deference under § 2254(d) but are reviewable *de novo. See Cuyler v. Sullivan,* 446 U.S. 335, 341–342, 100 S.Ct. 1708, 1714–1715, 64 L.Ed.2d 333 (1980). But, on the other hand, the Court held that the federal courts should have deferred to the state court finding as presumptively correct. 104 S.Ct. at 457. The Court wrote:

> Nevertheless, the factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. See 28 U.S.C. § 2254(d) [28 U.S.C. § 2254(d)]; *Sumner v. Mata,* 449 U.S. 539 [101 S.Ct. 764, 66 L.Ed.2d 722] ... (1981). *The substance of the ex parte communications and their effect on juror impartiality are questions of historical fact entitled to this presumption.* Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence "convincing evidence" to the contrary, by the federal courts. See Marshall v. Lonberger, 459 U.S. 422, 432–433, 103 S.Ct. 843, 850 (1983), 74 L.Ed.2d 646. Here, both the state's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of "fact"—on a question the state courts were in a far better position than the federal courts to answer—deserves a "high measure of deference," Sumner v. Mata, 455 U.S. 591, 598 [102 S.Ct. 1303, 1307, 71 L.Ed.2d 480] ... (1982), and may be set aside only if it "lack[s] even 'fair support' in the record." Marshall v. Lonberger, supra, ...

*Id.* at 456–457 (emphasis added). The Court concluded its decision with the statement that the federal courts should have deferred to the state court's finding of harmless error, *id.* at 457, despite the Court's earlier statement that harmless error was a question of federal law.

We need not untangle *Rushen*'s meaning because *Rushen* does not dictate that in this case the question of juror prejudice is purely one of fact. The state court here unlike in *Rushen* never determined whether constitutional error occurred, a legal conclusion we must derive from the facts found by the appellate court as to the events which transpired. Moreover, as to the determination of whether any constitutional error which occurred was harmless, we look to *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961), in which the Supreme Court held that a question of bias of an entire jury is a mixed question of law and fact. The *Irvin* Court quoted from *Reynolds v. United States,* 98 U.S. 145, 156, 8 Otto 145, 25 L.Ed. 244 (1878), in which the Court had made clear that the factual component of the question is the credibility determinations that can be made based on jurors' statements regarding their ability to be fair, and said that these factual questions must be tried by the trial court "like any other issue of that character, upon the evidence.... In such cases the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. This is seen below, but cannot always be spread upon the record." *Id.* 98 U.S. at 156–157. By contrast, where as here a court must determine whether an entire jury can be fair despite extra-judicial contacts and without regard to jurors' self-assessments, legal conclusions of the state court require no deference. In *Patton v. Yount,* ⸺ U.S. ⸺, ⸺, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), decided in the same term as *Rushen,* the Court reaffirmed the distinction between *Rushen*'s analysis of the review to be given a state court's credibility finding of any one juror's partiality as a question of historical fact, and *Irvin*'s analysis of the review of the mixed question of law and fact when the partiality of the trial jury as a whole is at stake.

This case falls on the *Irvin* side of the line. According to the facts found by the appellate court, several jurors saw

the posted list of charges and the jury as a whole discussed the list during deliberations. *People v. Eddington,* 453 N.E.2d at 1386. The trial court did not learn about the exposure until after the jury returned its verdict, and therefore during trial it neither questioned the jurors individually nor observed them as a whole to assess their partiality. Indeed, the trial court made no credibility or character determinations as were made by the state court in *Patton,* —— U.S. at —— - ——, 104 S.Ct. at 2891–2892, where the Supreme Court found as "good reasons to apply the statutory presumption of correctness" the facts that the determination was made "only after an often extended *voir dire* proceeding designed specifically to identify biased veniremen" and that "the determination is essentially one of credibility, and therefore largely one of demeanor." Here, the determination to be made, once the facts of the jury exposure were known, could not be assessed by weighing testimony. When an extra-judicial contact occurs during trial and is not discovered until after a verdict is reached, under both Illinois and federal law, a court may not question jurors about the thought process by which they arrived at the verdict or the extent to which the information affected the verdict. *See Chalmers v. City of Chicago,* 88 Ill.2d 532, 59 Ill.Dec. 76, 431 N.E.2d 361, 363 (1982); Fed.R.Evid. 606(b). Rather, the determination is whether, as a matter of law, the facts amount to a denial of Petitioners' Sixth Amendment rights and if so, whether that denial is harmless error. The court must draw a conclusion based on the relevant facts as to the legal effect of the improper contact. We may review this legal conclusion of the state court *de novo.*

Petitioners maintain that they have not received an adequate hearing to develop the relevant facts because the state trial court erroneously refused to consider the testimony given at the post trial hearing. Petitioners analogize their case to *Owen v. Duckworth,* 727 F.2d 643, 645 (7th Cir. 1984), in which the Court of Appeals for the Seventh Circuit found that a full, fair and adequate hearing was not provided when a trial court declined to consider the post trial testimony of a juror who was improperly exposed to an *ex parte* contact during trial. Respondents, on the other hand, also primarily relying upon *Owen,* allege that what is at issue here is not whether the trial court misapplied the Illinois law regarding impeachment of verdicts, but whether Petitioners were afforded a full, fair, and adequate hearing by a combination of actions taken by the trial and appellate courts.

We agree with Respondents that *Owen* presented a different situation than does this case. In *Owen,* after the jury brought in a guilty verdict, the defense learned that a juror who had received a threatening telephone call during trial had, contrary to court instructions, informed other members of the jury about the telephone call. The trial court began holding a hearing, but terminated the hearing before Owens had presented all of his evidence. As a result, the Court of Appeals for the Seventh Circuit remanded the case to the district court for a full evidentiary hearing. *Id.*

*Owen* is readily distinguishable from the case at bar in that the trial court there aborted the post trial hearing before the testimony was completed. Petitioners here were allowed to present all of the testimony in support of their claim before the trial court declined to consider Petitioners' testimony. The trial court denied them a full, fair, and adequate hearing because it made no findings. We must determine whether the appellate court held a "hearing" within the meaning of § 2254(d) when it considered the record of the trial court proceedings, including the juror's post trial testimony, and found that Petitioners had not been prejudiced by the extra-judicial information.

The United States Supreme Court in *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), interpreted § 2254(d)'s "full, fair, and adequate hearing" requirement as being capable of satisfaction by appellate review of a trial court record. In *Mata,* convicted defendant *Mata* had raised for the first time before a

state appellate court his claim that an in-court identification was unconstitutional because of an impermissible pretrial photographic identification procedure. *Id.* 449 U.S. at 541–542, 101 S.Ct. at 766–767. The state appellate court had reviewed the state trial court record, *id.* at 543, 101 S.Ct. at 767, and found no constitutional error. The Supreme Court decided that the appellate court had thereby provided Mata with a full, fair, and adequate hearing. The Supreme Court stated:

> [I]t has been contended that [§ 2254(d) should not be applicable to the situation where] a state appellate court, as opposed to a trial court, makes the pertinent factual findings. We, however, refuse to read this limitation into § 2254(d). Admittedly, the California Court of Appeals made the factual determination at issue here and it did so after a review of the trial court record. Nevertheless, it clearly held a "hearing" within the meaning of § 2254(d). Both respondent and the State were formally before the court. Respondent was given an opportunity to be heard and his claim received plenary consideration even though he failed to raise it before the trial court.... [§ 2254(d)] makes no distinction between the factual determinations of a state trial court and those of a state appellate court.

*Id.* at 545–546, 101 S.Ct. at 768–769 (footnote omitted).

The *Mata* decision is not dispositive in this case because the court repeatedly qualified its discussion by the fact that Mata had not raised his constitutional claim before the state trial court. *See id.* at 546, 101 S.Ct. at 768–769 (respondent, having requested the appellate court to decide the issue, "may [not] now be heard to assert that its proceeding was not a 'hearing' within the meaning of § 2254(d)"); at 547, 101 S.Ct. at 769 (idea that federalism requires deference to state court factual findings is "true particularly in a case such as this where a federal court makes its determination based on the identical record that was considered by the state appellate court and where there was no reason for the state trial court to consider the issue because respondent failed to raise the issue at that level") (citation omitted). In fact, the Court noted that, unless the "cause" and "prejudice" standard of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), was met, Mata could not have received consideration of his habeas claim in federal court if the state appellate court had found forfeiture of the claim. *Id.* In this case, it cannot be said that Petitioners forfeited whatever right exists to have factual findings made by the trial court or to have the same court both receive testimony and make factual findings therefrom.

The Court of Appeals for the Seventh Circuit has found, however, that § 2254(d)'s guarantee of a "full, fair, and adequate hearing" does not contain any such right to have both the record developed and factual findings made by the trial court. The issue arose in the case of *United States ex rel. Harris v. State*, 457 F.2d 191 (7th Cir.), *cert. denied*, 409 U.S. 860, 93 S.Ct. 147, 34 L.Ed.2d 106 (1972), where the court considered whether "a reviewing court which does not hear testimony and which only has a cold record in front of it may properly make ... a factual determination" regarding the constitutionality of an in-court identification. *Id.* at 195. The defendant in that case had originally presented his constitutional claim at a pretrial hearing before the state trial court. On review, the Illinois Supreme Court had found that the trial court applied an improper standard in determining not to suppress the identification. The Illinois Supreme Court had then itself reviewed the trial court record, rather than reversing the conviction or ordering the trial court to hold a rehearing, as requested by the defendant, and had found that even under the proper standard the identification was admissible. The Court of Appeals for the Seventh Circuit held that so long as the record was adequate for the appellate reviewing process to satisfy the constitution, the habeas statutory hearing requirement was met. The court stated:

While we believe that the trial court is the most proper place for the determination to be made, we cannot conclude that such a resolution by a reviewing court when the record is adequate amounts in and of itself to any constitutional deprivation. . . .

A review of the record before the Illinois Supreme Court indicates that enough facts were contained therein to enable the reviewing court constitutionally to determine if the requirements [for constitutionality of the identification] had been met. This conclusion requires us to accept the factual findings as true.

*Id.* at 196.

We believe that *Harris* controls this aspect of this case. The trial court here, as in *Harris,* misapplied the law, resulting in this case in a failure of the trial court to make any findings. The appellate court, however, was able to review the complete records of the trial and post trial hearing. Since Petitioners fully questioned the juror whom they wished to have testify at the post trial hearing, and since, as discussed *supra,* credibility determinations were not called for, enough facts were present for the trial court, and by extension the appellate court, to determine what events occurred regarding the jurors' contact with the list. Hence, Petitioners received a "full, fair, and adequate hearing" from the state court.

█ Thus, we must consider whether the facts provided by the state court proceedings amount to constitutional error. We find that they do.

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana,* 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). Thus, the Court of Appeals for the Seventh Circuit

found a constitutional violation where jurors examined fingerprint cards which were properly admitted in evidence but which, unbeknownst to the judge and lawyers, contained criminal histories of the defendant on their reverse sides. *United States v. Dressler,* 112 F.2d 972 (7th Cir.1940). The court wrote in terms applicable to this case:

> The foregoing information [about prior arrests and convictions] was before the jury during their deliberations in the jury room without any instructions or direction by the court, and we are not free to conjecture that the members of the jury were conscious of any limitations or restrictions upon their use of it.
>
> It is not questioned by the government that the information conveyed to the jury under the heading "Criminal History" on each card was inadmissible and should not have been permitted to go to the jury. . . .
>
> It is inconsistent with our traditional concept of a fair trial to permit any information to go to a jury which might influence the jury to convict a defendant for any reason other than that he is guilty of the specific offenses with which he is charged.

*Id.* at 977. *See also Farese v. United States,* 428 F.2d 178 (5th Cir.1970), and cases cited therein; *Lacy v. Gabriel,* 567 F.Supp. 467, 469 (D.Mass.1983).

In this case, the jurors saw and discussed the list of numerous charges against Petitioners which were not in evidence. We presume that the information on the list was inadmissible; and even if admissible, Petitioners were entitled to impeach its significance, argue to the jury about its proper characterization and probative value, and have limiting instructions provided by the judge. *See United States v. Bruscino,* 662 F.2d 450, 458 (7th Cir.1981). None of these protections occurred. While the trial judge instructed the jury regarding its consideration of evidence of an unrelated occurrence giving rise to Petitioners' arrest,[*]

---

[*] "Evidence has been received that the defendants

may have been involved in an offense other

this instruction referred solely to the specific evidence, received in court, pertaining to Petitioners' arrest, and cannot be extended to cure the effect of viewing fifteen or so unexplained charges. This is a classic deprivation of the right of confrontation.

Nevertheless, if the error was harmless beyond a reasonable doubt, we cannot reverse Petitioners' convictions. To mandate reversal, the possibility of prejudice must not be merely speculative, but must raise " 'the kind of doubt which, as judges instruct juries, would cause reasonable men to hesitate in making an important decision in their own lives.' " *Siverson v. O'Leary*, 764 F.2d 1208, 1220 (7th Cir.1985) (citation omitted). On the other hand, to mandate application of the harmless error rule, the evidence against Petitioners must be "overwhelming," not merely circumstantially suggestive. *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1303 (7th Cir.1985). Granting the difficulty of second-guessing how the jury would have proceeded without viewing the list, we find the evidence against Petitioners strong enough to preclude any reasonable doubt that the list of criminal charges seen by the jury influenced the outcome of the trial.

The state's evidence developed at trial as follows. The first prosecution witness, Warren Hardnick, testified that he and a friend, the alleged kidnap victim Barbara Montley, drove to a park called Miller's Meadow North on the day of the alleged crime, Saturday, June 6, 1981. At approximately 5:00 p.m. Barbara Montley's boyfriend Alvin arrived at the park and the three of them began to argue. A small crowd gathered. A black man approached Alvin and said something to the effect of, "You lost your girl. You shouldn't say anything to that guy [Hardnick] about it." Hardnick and Barbara Montley returned to Hardnick's car and he began to drive. When they reached a certain intersection, a black four-door Cadillac pulled up behind

them. A black man got out of the Cadillac, came to the passenger door of Hardnick's car, and told Barbara Montley that he was a cousin of her boyfriend and would take her to him. The man opened the car door, grabbed Barbara Montley by the hand, and she exited Hardnick's car. Hardnick then drove off around the corner.

Barbara Montley testified next. She corroborated Hardnick's recital of the incident at the park. She described two members of the group that approached Hardnick, Alvin, and her in the park as black men; one short with darker skin and braided hair, whom she identified in court as defendant Hart; and the other taller, with lighter skin and straight hair, whom she identified in court as defendant Eddington. She identified Eddington as the man who took her from Hardnick's car to a car which she described as big, black and four-doored. She sat in the car's back seat. In the car were Hart, who was driving, and two black men in addition to Eddington. Hart drove around for approximately thirty minutes. Barbara Montley began crying. Hart pulled into a side street and let the two men other than Eddington out of the car. Hart then drove onto an expressway. Barbara Montley began screaming. Eddington held his arm around her neck, choked her and hit her. Montley tried to open the door nearest her but it did not work. She jumped out the other back door window. She hit the expressway hands first, and rolled over to the side of the road, where several people assisted her. Montley testified that she was in the car for about 45 minutes, during daylight, and that she could see Eddington's face next to hers, clearly. She did not have as sustained a view of Hart, but saw him directly in the park for about five minutes and in the car when he turned to tell her to be quiet. Several days after the incident Montley viewed a lineup of six people who each stepped forward and spoke. She chose Eddington and Hart from the lineup.

than that charged in the information. This evidence has been received solely on the issue of the circumstances of the defendant's [sic] arrest.

This evidence may be considered by you only for the limited purpose for which it was received."

Charles Kolar next testified that he was driving on the Eisenhower Expressway between 6:00 and 6:30 on June 6, 1981, when he noticed a big, dirty, black Cadillac pulling in and out of lanes and saw someone fighting in the back seat. As the car passed him, Kolar saw a woman whom he identified in court as Barbara Montley jump out of it and fall on her hands onto the expressway.

Officer Robert Barta testified that he was driving in a squad car on the Eisenhower Expressway when he saw cars gathered on the left shoulder and saw Barbara Montley, emotionally shaken and hands badly scraped. Barta took Montley to the hospital, where he notified Cook County Sheriff's Department Officer Fernando Reyes about the alleged kidnapping which began in Cook County and ended in Maywood.

Officer Reyes testified that he broadcast information about the kidnapping over the police radio. Several nights later, on Wednesday, June 10, 1981, at 11:00 p.m., Reyes was working in Miller's Meadow North. He approached a black, four-door, 1971 Cadillac parked in a lot and shined a flashlight. Two men, whom Reyes identified in court as Eddington and Hart, were fastening their pants, and a woman was crying in the back seat. Reyes ascertained that Hart was the driver of the car. He arrested Hart and Eddington. Prior to trial, Reyes examined the black Cadillac and found that the rear passenger side door did not open properly.

Finally, Officer Willie Miranda testified that on the day of the alleged kidnapping, he was in Miller's Meadow North at approximately 5:10 p.m. directing traffic in the aftermath of a traffic accident. He approached a four door Cadillac with three black males in it, and told the driver, whom he identified in court as Hart, to back his car up. Hart did not respond and Miranda, holding his face four or five inches from Hart's, repeated his direction. Miranda testified that he remembered the car and Hart because Hart was the only driver who did not comply with his instructions. Later

in the evening he heard Officer Reyes' radio broadcast and informed Reyes of the car he had stopped prior to the incident. He described the driver as a black male, 5'6" to 5'8", stocky, dark complected, wearing braids in his hair, and the right front passenger as a black male, 5'10" to 6'0", light complected with a slender build. On June 10, 1981, Miranda was standing in the lockup where Hart and Eddington were brought in. He recognized them as the driver and front seat passenger of the car he had stopped.

The defense called the following witnesses. Stephanie Eddington, defendant Eddington's fifteen year old sister, testified that on the day of the alleged kidnapping, from 6:00 to 8:00 p.m., she watched Eddington play basketball at a park on Bellwood Avenue. She knew the time because she needed to be home at a certain time and watched a clock in a drugstore around the corner from the basketball court. She testified on cross-examination that she did not see Hart on June 6, 1981.

Reginald Williams, a friend of Eddington, testified that he played basketball with Eddington on that day from about 4:30 p.m. until about 8:00 p.m. He saw Stephanie Eddington at the park.

Alma Sanders testified on behalf of Hart that she was the mother of Hart's girlfriend, Nanette Sanders. On June 6, 1981, she was at home barbecuing at about noon when Hart arrived to pick up Nanette. Sanders later called Hart's home at about 6:00 p.m. and spoke to Hart, telling him to bring Nanette home. She called and gave Hart the same message at about 7:45 p.m. She saw Hart at about 8:00 p.m. when he brought Nanette home. On cross-examination, Sanders said that Hart drives a black Cadillac.

Nanette Sanders testified that on June 6, 1981, she was at Hart's house from approximately 1:30 p.m. until approximately 8:00 p.m. She corroborated that her mother called at about 6:00 and shortly before 8:00. She said she did not leave Hart's presence all day, and did not see Eddington that day. On cross-examination, she said she and

Hart spent the day watching television, listening to the radio, and having sex.

Finally, the defense recalled Alma Sanders to testify that after a prior court hearing, Barbara Montley had told her and Nanette that she was unsure of her identification of Hart and Eddington except that one was light-skinned and one dark. Barbara Montley denied making such a statement, and Nanette testified only that Montley did not say she was sure of the identification.

We are convinced from our review of the record that the viewing of the list was harmless beyond a reasonable doubt. Of course, "[t]he task of reconstructing what occurred—or might have occurred—during a trial is always difficult, and all the more so when we must guess at what transpired in the confines of the jury deliberation room." *Siverson v. O'Leary,* 764 F.2d 1208, 1220 (7th Cir.1985). Nonetheless, in this case, where the identity of the perpetrators was the only real issue, the victim's eye-witness identifications of the defendants, with whom she claimed to have spent nearly an hour, were forcefully corroborated. Officer Miranda's testimony placed the defendants in the park, in a four-door Cadillac, shortly before the time Montley claimed they approached her in the park. Montley's description of the car in which she was kidnapped matches that of the car which Miranda saw them in, as well as Officer Reyes' description of the car they were in five days later in the same park at the time of their arrest. Reyes testified that Hart admitted to being the car's driver, a fact which Alma Sanders corroborated on cross-examination. Reyes found that the door of the car Hart and Eddington were arrested in did not open properly, as Montley testified about the car in which she was kidnapped. We believe that any reasonable jury, without reference to the prejudicial list, would have convicted both defendants.

Accordingly, the petition for a writ of habeas corpus is denied.