909 F.2d 1485
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Phillip Gregory TATE, Petitioner-Appellant,
v.
Terry L. MORRIS, Respondent-Appellee.
 No. 89-3570.
 United States Court of Appeals, Sixth Circuit.
 Aug. 14, 1990.
 
 Before KEITH and RALPH B. GUY, Jr., Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Petitioner, Phillip Gregory Tate, appeals from the judgment of the district court denying his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. Sec. 2254. Challenging his conviction for violation of the Ohio rape statute, Ohio Rev.Code Ann. Sec. 2907.02(A)(1), the petitioner raises the following claims: (1) the ex parte communication between the trial court and the jury during deliberations was a violation of the petitioner's due process rights; (2) the denial by the trial court of the petitioner's motion for a continuance was a denial of due process; (3) the admission of an in-court identification of the petitioner by the victim violated his rights to due process; (4) the admission of an out-of-court voice identification was a violation of the petitioner's right to due process of law; and (5) the evidence was insufficient to sustain a finding of guilt beyond a reasonable doubt. Finding all of the petitioner's claims to be without merit, we will affirm the denial of his petition for a writ of habeas corpus.
 
 I.
 
 2
 Tate was charged with a rape of a high school senior that occurred on December 1, 1984. In the months preceding the rape, the victim had met a young man named Todd Hickman on a few occasions, and she had spoken with him on the telephone. She began to receive telephone calls from someone pretending to be Hickman, and she eventually made arrangements to meet this person at a relatively secluded location on the night of December 1. The victim drove to the meeting at 11:00 p.m., but the man she met there was not Hickman. Pretending to be Hickman's brother, he climbed into the victim's auto and raped her shortly thereafter.
 
 
 3
 A jury found Tate of guilty of rape, and the judge sentenced Tate to a term of fifteen to twenty-five years in prison.
 
 
 4
 After his conviction, Tate filed motions for a new trial, one based upon alleged error arising from the trial judge's ex parte communication with the jury during deliberations, and one based upon newly discovered evidence. The trial judge overruled the motions.
 
 
 5
 Tate appealed the judgment to the Ohio Court of Appeals, raising the following assignments of error: (1) it was prejudicial error for the judge to communicate directly with the jury without the knowledge and consent of the defendant or his counsel; (2) the court erred by not granting the defendant's motion for a continuance; (3) the verdict was against the manifest weight of the evidence; and (4) the admission of a voice identification that occurred under circumstances giving rise to a substantial likelihood of irreparable misidentification was a denial of due process. The court of appeals overruled all the assignments of error and affirmed the conviction.
 
 
 6
 Tate then sought leave to appeal to the Ohio Supreme Court, raising the following allegations of error in his memorandum in support of jurisdiction:
 
 
 7
 (1) It is prejudicial error for the court to communicate with the jury, in the jury room, in the absence of, and without the knowledge and consent of defendant or his counsel.
 
 
 8
 (2) The court's refusal to permit a defense continuance to present the testimony of a newly discovered witness was error prejudicial to the defendant.
 
 
 9
 (3) It was prejudicial error for the court, over objection, under circumstances giving rise to a substantial likelihood of irreparable misidentification [sic].
 
 
 10
 (4) Defendant was denied due process of law by the admission of a voice identification, over objection, under circumstances giving rise to a substantial likelihood of irreparable misidentification.
 
 
 11
 (5) The verdict of guilty was against the manifest weight of the evidence.
 
 
 12
 The Ohio Supreme Court denied the motion for leave to appeal in a one-sentence order: "Upon consideration of the motion for leave to appeal from the Court of Appeals for Summit County, it is ordered by the Court that said motion is overruled."
 
 
 13
 On May 7, 1987, Tate filed his petition for a writ of habeas corpus in federal district court, in which he raised the same issues as those presently before this court. The petition was referred to a magistrate, who recommended that it be denied. The district court dismissed the petition, and this appeal followed.
 
 II.
 
 14
 Before a state prisoner may seek a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254, he must first fairly present all of his constitutional claims for relief to the appropriate state courts. 28 U.S.C. Sec. 2254(b), (c); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Pillette v. Foltz, 824 F.2d 494, 497 (6th Cir.1987). In this case, Tate presented four of his five claims to both the court of appeals and the supreme court. His fifth allegation of error, the one in which he challenges the admission of the in-court identification, was first raised in his memorandum in support of jurisdiction before the Ohio Supreme Court. Because the supreme court's order does not specify whether the denial of leave to appeal was based upon substantive or procedural grounds, the district court grappled with the question whether the petitioner's state court remedies had been exhausted with respect to this fifth claim. The magistrate determined that Tate's failure to raise the issue on direct appeal from the conviction constituted a procedural default precluding habeas review. In support of this conclusion, the magistrate relied on Gilbert v. Parke, 763 F.2d 821 (6th Cir.1985). In Gilbert, this court held that where the state argues both the merits and procedural default, and the state court does not specify the basis for its decision, the federal court will not presume that the decision was based on the merits. The district court in this case declined to adopt this portion of the magistrate's report and recommendation and instead construed the supreme court's refusal to review Tate's claim as a rejection on the merits. See Meeks v. Bergen, 749 F.2d 322 (6th Cir.1984). The reasoning of the magistrate and of this court in Gilbert no longer holds after the recent United States Supreme Court decision of Harris v. Reed, 489 U.S. 255 (1989). In Harris, the Court held that if the last state court rendering judgment on a claim clearly rests its judgment on a procedural default, then the petitioner has not exhausted his state court remedies. Id. at ----, 109 S.Ct. 1038, 1043. However, a decision will not be construed as being based upon a procedural bar unless the state court's expression of this intention is clear. Id. In Hill v. McMackin, 893 F.2d 810 (6th Cir.1989), this court determined that an order of the Ohio Supreme Court that was similar to the one in this case was not based upon a procedural bar. Neither the order in Hill nor that in the case at bar specified whether the decision was procedurally grounded. Therefore, we conclude that Tate has exhausted his state court remedies with respect to all of his claims, and that his petition is ripe for federal court review on the merits.
 
 III.
 
 15
 A. Ex Parte Communication by the Trial Judge with the Jury
 
 
 16
 The petitioner argues that he was denied due process of law because of an ex parte communication between the trial judge and the jury that took place during the jury's deliberations. The jury began its deliberations at approximately 11:30 a.m. They broke for lunch from noon to 1:00 p.m., and at approximately 2:30 p.m., the jurors sent a note to the judge indicating that they were unable to reach a verdict. The note voluntarily informed the judge that the jurors were split seven in favor of acquittal and five in favor of guilty. Without notifying either party, the judge met with the jury and made the following statement on the record:
 
 
 17
 THE COURT: The gist of the note to me is that you have a mixture here of guilties and not guilties.
 
 
 18
 Let me say only this, that that would certainly not surprise me at this point in the deliberations. It has been very brief. We are talking something like just about two hours in your deliberations.
 
 
 19
 I can hardly really consider that sufficient time and discussion that I would consider that a hopeless state of affairs. I think that you have to continue your deliberations and continue your discussion. I simply feel that it has been insufficient time to give it adequate, the thorough consideration that it would need.
 
 
 20
 I would just instruct you at this point that I'm simply going to have to ask you to give it more time and to continue to deliberate. Perhaps there is something you are missing or someone is overlooking or something that will come up that may make some difference here, but I think it hasn't been sufficient time to determine that. So at this point, at least, we will just continue deliberations.
 
 
 21
 The judge summoned counsel for both the petitioner and the prosecution to the courtroom about one hour later and informed them of the jury's note. The judge informed the attorneys that she had handled the matter ex parte, and the parties did not move for a mistrial, object to the court's instruction, or seek a supplemental instruction.
 
 
 22
 At approximately 4:30 p.m., the jury returned a verdict of guilty. The defendant made a motion for a new trial, which the court denied.
 
 
 23
 The petitioner had a fundamental right to be present at every stage of his criminal trial, including when the court responded to the jury's note. United States v. Gagnon, 470 U.S. 522 (1985). However, the violation of the petitioner's due process rights in this manner is subject to a harmless error analysis. Rushen v. Spain, 464 U.S. 114 (1983). As stated by the Supreme Court in Chapman v. California, 386 U.S. 18 (1967), the harmless error inquiry turns on whether " 'there is a reasonable possibility that the [error] complained of might have contributed to the conviction.' " Id. at 23 (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)). Our task in this case is to determine whether the ex parte communication prejudiced or biased the jury's consideration of the case, taking into consideration the totality of the circumstances. Jones v. Norvell, 472 F.2d 1185 (6th Cir.), cert. denied, 411 U.S. 986 (1973). Although the question of whether the constitutional error was harmless is one of federal law, the factual findings of the state courts' post-trial hearings are entitled to a presumption of correctness. Rushen, 464 U.S. at 120; 28 U.S.C. Sec. 2254(d).
 
 
 24
 The trial court in this case heard both parties on the defendant's motion for a new trial, and she took the matter under advisement before denying the motion. As the Supreme Court stated in Rushen, "[t]he prejudicial effect of [an ex parte communication] can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred. Post-trial hearings are adequately tailored to this task." Id. at 119-120 (citations omitted). The judge's statement to the jury was made on the record, and the transcript from the motion for a new trial indicates that the trial judge carefully considered the arguments of both the defendant and the state. She determined that any error that occurred was harmless.
 
 
 25
 In addition, the Ohio Court of Appeals gave careful consideration to the petitioner's claim of prejudice, and it likewise determined that any error was harmless:
 
 
 26
 The ex parte communication complained of herein was innocuous. The judge did not address any fact in controversy nor any law applicable to the case. There was no substantive communication. The defendant was not prejudiced by this interaction. Furthermore, the defense was aware of the communication before the verdict was returned and chose not to ask for a mistrial. The first assignment of error is overruled.
 
 
 27
 In order to rebut the presumption of correctness to which the above state court findings are entitled, the petitioner must demonstrate that the findings lack even fair support in the record. Rushen, 464 U.S. at 120. Tate argues that the totality of the circumstances indicates that the judge's instruction to the jury was prejudicial. He first argues that the instruction was a modified and defective Allen charge. In Allen v. United States, 164 U.S. 492 (1896), the Supreme Court held that, under certain circumstances, in cases in which a jury is deadlocked, the judge may order the jury to reach a verdict. The judge's statement to the jury in this case certainly did not constitute an Allen charge. She did not order the jury to return a verdict. Rather, she simply ordered them to continue their deliberations.
 
 
 28
 Tate also urges this court to conclude that this case is similar to the Second Circuit case of Krische v. Smith, 662 F.2d 177 (2d Cir.1981), in which the court found the duration of the jury's deliberations following the ex parte communication to be a critical factor in determining whether the error was harmless. In Krische, the judge instructed the jury to continue its deliberations because " 'it's not soon enough.' " Id. at 178. After deliberating only for another hour and twenty minutes, the jury returned a verdict of guilty. Counsel was not informed of the ex parte communication until after the verdict was returned. In United States v. Frazin, 780 F.2d 1461 (9th Cir.), cert. denied, 479 U.S. 839 (1986), the Ninth Circuit found an ex parte communication by the judge to be harmless error when the jury continued its deliberations for an additional three and one-half hours after the judge's statement. In the case at bar, the jury continued to deliberate for a full two hours after the judge's instruction, and counsel was informed of the exchange soon after it had taken place.
 
 
 29
 Although the duration of the jury's deliberations following its communication with the judge is a factor to consider when determining whether the jury was prejudiced by the judge's statement, it is not the only factor to consider. The length of the jury's deliberations must be considered in the context of the coercive or non-coercive nature of the judge's statement itself. Here, there was nothing coercive about the judge's comments. She did not urge the jury to reach a verdict, and the judge's communication to the jury in this case was innocuous. She did not instruct them on the law or evidence of the case, nor did she give any indication which way she thought they should be leaning. She merely told them that two hours was not sufficient time to reach a decision in the case, and that they should make sure that they had considered all of the evidence in the case. Evaluating the judge's error in the totality of the circumstances, we agree with the conclusion of the district court that the ex parte communication with the jury constituted harmless error.
 
 
 30
 B. The Denial of the Defendant's Motion for a Continuance
 
 
 31
 Tate next challenges the trial court's refusal to grant his motion for a continuance. On Thursday, February 14, 1985, petitioner closed his case-in-chief and court adjourned. The following morning, prior to closing arguments, counsel for the petitioner moved for a continuance. He informed the court that Tate had called him at about 11:00 p.m. the night before to tell him that he had two witnesses who would present exculpatory testimony. At the time he moved for a continuance, counsel had not met either of these individuals, and he had only an unsworn statement from one of them.[1] The court overruled the petitioner's motion, and the trial proceeded to its conclusion.
 
 
 32
 The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. Bennett v. Scroggy, 793 F.2d 772 (6th Cir.1986). The judge's decision to deny such a motion will not be disturbed unless the abuse of discretion has "been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." Id. at 774-75. There must also be a showing that a continuance would have "furthered the court's attempt to secure a just determination of the cause." Id. at 775. In order to determine whether the denial of the petitioner's motion for a continuance violated his due process rights, we must look to the following factors:
 
 
 33
 the diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.
 
 
 34
 Id. at 774 (quoting Hicks v. Wainwright, 633 F.2d 1146, 1149 (5th Cir.1981)). In this case, it can hardly be said that the trial judge abused her discretion by denying the petitioner's motion for a continuance. The testimony of these new witnesses allegedly dealt with the whereabouts of the victim and whom she was with at the time of the offense. However, counsel had not interviewed either witness and had an unsworn statement from only one. Counsel for the petitioner failed to demonstrate how the new evidence would aid his client's case, and he failed to describe the evidence with adequate specificity. The judge acted within her sound discretion by denying the petitioner's motion for a continuance.
 
 
 35
 C. The Admission of the In-Court Identification by the Victim
 
 
 36
 While testifying at the petitioner's trial, the victim identified Tate as the man who had raped her. The petitioner challenges the admission of this in-court identification on the grounds that its admission violated his rights to due process. Convictions based on in-court eyewitness identifications may be set aside if the pretrial identification procedure that preceded the in-court identification was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). However, even if the identification procedure is unduly suggestive, due process is not violated when, under the totality of the circumstances, the identification was sufficiently reliable. Neil v. Biggers, 409 U.S. 188, 199 (1972). The factors we must consider in order to evaluate the likelihood of misidentification include:
 
 
 37
 the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
 
 
 38
 Id. at 199-200.
 
 
 39
 The victim testified that, on the night of the rape, she saw the rapist as he approached her car, and she recognized that he was not Hickman. The rapist opened the car door to climb in, and the dome light of the automobile came on for about five seconds. The victim testified that she saw the rapist's face as he stepped into her car. This was the only time during the crime that the victim got a good look at the rapist's face, both because it was dark and because he later covered both his face and hers.
 
 
 40
 On two separate occasions after the rape, the police showed the victim photo arrays, both of which contained a picture of the petitioner. The victim was unable to identify the petitioner in either array.
 
 
 41
 Before testifying at a suppression hearing, the victim saw the petitioner in the hallway of the courthouse and recognized him as the rapist. She had been having a conversation with the prosecutor, police, family, and friends, and she casually glanced around the area. She saw Tate walking down the hallway toward the courtroom, and she became very upset, immediately recognizing him as the rapist. She testified that because she was only looking at his face, she did not notice that he was accompanied by a deputy sheriff. She further testified that this was the first time that she had seen the rapist since the night of the rape. Her in-court identification was based exclusively on her identification of the rapist on the night of the crime and her identification of the petitioner in the hallway before testifying.
 
 
 42
 The victim's identification of the petitioner in the hallway of the courthouse was made under very suggestive circumstances. She probably expected to see the man who had raped her at the hearing, and Tate was being escorted by a deputy sheriff. Therefore, we must apply the Neil v. Biggers factors to this case. On the night of the rape, the victim had ample opportunity to look at the rapist's face at close range when he climbed into her car. In addition, when she saw the petitioner in the hallway of the courthouse, she was absolutely certain that he was the man who had raped her. Less than two and one-half months had passed since the rape, which further adds to the reliability of her identification.
 
 
 43
 Her failure to identify Tate in the photo arrays does not render her in-court identification unreasonably unreliable. United States v. Causey, 834 F.2d 1277, 1286 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988). As this court has held:
 
 
 44
 The fact that a witness cannot identify an accused from a photograph is no reason for excluding his testimony identifying the accused in court. When a man is actually seen in court, his expression, the glance from his eyes, the movement of his facial features may be, to a witness, much more convincing that he has seen that man before than observations of a photograph taken of the accused, or views of him at a "line-up" or police "show-up."
 
 
 45
 Id. at 1286 (quoting United States v. Toney, 440 F.2d 590, 591 (6th Cir.1971)). The victim's failure to identify Tate in the photo arrays goes only to the weight of her testimony, not to its admissibility. Causey, 834 F.2d at 1286.
 
 
 46
 The totality of the circumstances surrounding the victim's in-court identification of Tate sustains the conclusion that, despite the suggestiveness of the confrontation procedure, the admission of the identification did not violate due process.
 
 
 47
 D. The Admission of the Out-of-Court Voice Identification
 
 
 48
 Tate argues that the admission by the court of an out-of-court voice identification of the rapist by the victim was so impermissibly suggestive and unreliable that the petitioner's due process rights were violated.
 
 
 49
 The day after the rape, the victim told Hickman what had occurred. Based upon her description of the rapist, he speculated that the rapist was a friend of his named Phil Tate. Using a telephone permitting conference calls, Hickman dialed Tate's telephone number. The victim heard Tate say only one word, "Hello." She identified this voice as being that of the man who had raped her.
 
 
 50
 The circumstances surrounding this voice identification were certainly suggestive, as both Hickman and the victim expected that the voice would be that of the rapist. Therefore, we must again examine the totality of the circumstances to determine whether the identification bore sufficient indicia of reliability to satisfy the demands of due process. The factors to be considered when evaluating an aural identification are the same as those considered when evaluating a visual identification. United States v. Patton, 721 F.2d 159, 162 (6th Cir.1983).
 
 
 51
 The victim heard the rapist's voice on a number of occasions before, during, and after the rape. He had telephoned her several times, and he talked to her throughout the commission of the rape itself. He also telephoned her a few times after the rape. Although she sometimes had confused the rapist's voice with that of Hickman when talking with him before the rape, she was often aware that the voice she heard was not Hickman's. She was also absolutely certain that the voice she heard during the conference call was that of the rapist. Finally, this voice identification occurred less than twenty-four hours after the rape, which adds significantly to its reliability. While an extended dialogue would have been more reliable than the single word "hello," the totality of the circumstances indicates that the voice identification was sufficiently reliable to satisfy due process.
 
 E. The Sufficiency of the Evidence
 
 52
 Finally, the petitioner argues that there was insufficient evidence to find him guilty beyond a reasonable doubt. When evaluating whether the evidence is sufficient, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). All conflicting inferences must be resolved in favor of the prosecution. Id. at 326.
 
 
 53
 The petitioner points to inconsistencies in the description by the victim of the rapist's clothes and in her identification of the petitioner's clothes at trial. However, these inconsistencies were minor, and her basic description was close to the clothes that were seized when Tate was arrested. In addition, the petitioner points out that the physical trauma that the victim suffered could have resulted from causes other than rape. However, the victim's physical symptoms were consistent with the trauma associated with rape, and we must again resolve this inference in favor of the prosecution.
 
 
 54
 Viewed in the light most favorable to the prosecution, the evidence presented at trial supports a finding of guilt by a rational jury. The victim made an in-court identification of Tate after having seen his face on the night of the rape. She also identified his voice, which she had heard on several occasions before, during, and after the rape. The evidence was sufficient to satisfy due process.[2]
 
 
 55
 The district court's denial of Tate's habeas corpus petition is AFFIRMED.
 
 
 56
 BAILEY BROWN, Senior Judge, dissenting.
 
 
 57
 I concur in the majority opinion in all respects except the holding that the trial court's giving of an additional charge to the jury out of the presence of petitioner and his counsel was harmless error beyond a reasonable doubt and that therefore habeas relief must be denied.
 
 
 58
 At the outset, it should be recognized (1) that respondent has conceded that the trial court's action was a denial of federal due process and (2) that while petitioner, upon learning of this action, did not move for a mistrial (but did later move for a new trial), the State courts have ruled on the merits of this contention and that petitioner's remedies have been exhausted.
 
 
 59
 The majority opinion concludes that relief must be denied if the error was harmless beyond a reasonable doubt; that the district court, in making this determination, was required to afford the State court's finding of harmlessness a presumption of correctness; and that, affording this presumption, we must agree that the error was harmless beyond a reasonable doubt. The majority opinion relies on, inter alia, Rushen v. Spain, 464 U.S. 114 (1983).
 
 
 60
 It is pointed out by Justice Stevens, concurring in the result in Rushen, 464 U.S. at 128 and note 7, that some constitutional rights are so basic that denial thereof is a basis for habeas relief whether or not the denial could be said to be harmless. I would think that if, for example, the trial court had given the entire and only charge out of the presence of petitioner and his counsel, this error would be a basis for relief even if the charge was perfect and therefore, in that respect, the error was harmless. However, I accept as valid the assumption of the majority opinion that the particular constitutional error here cannot be a basis for relief if it was harmless beyond a reasonable doubt.
 
 
 61
 In this case, it is without dispute that the jury sent word to the trial judge that it had voted seven to five for acquittal and that it was hung. At this point, the trial judge met with the jury and gave the additional charge quoted in the majority opinion. While petitioner argues that the additional charge itself was faulty, I agree with the majority opinion that it was not.
 
 
 62
 The interest of the petitioner was that he be found not guilty or, failing that, that there be a hung jury. The question therefore becomes: can we determine, beyond a reasonable doubt, that the jury would have reached a guilty verdict even if the additional charge had not been given. I do not believe that we, or the district court, even giving the State court finding a presumption of correctness, can so determine. This is true because the very purpose of this charge was to encourage a verdict and not to have a hung jury. It is unrealistic to say that, beyond a reasonable doubt, this additional charge to the jury was harmless to petitioner.
 
 
 63
 It can be argued, by framing the issue differently, that the error was certainly harmless. This would be that, since there was no error in the charge itself and that the only error was in giving the charge out of the presence of petitioner and his counsel and since the absence of petitioner and his counsel could not have affected the result, the error was certainly harmless. However, it seems to me that the issue is not whether their absence could have affected the result; rather, it is whether giving the charge at all in their absence, which was a denial of due process of law, could have affected the result.
 
 
 64
 Accordingly, I would grant relief on the ground that petitioner was denied due process of law and that there is reasonable doubt as to whether such denial affected the result.
 
 
 
 [1]
 By the time his motion for a new trial was heard, this unsworn statement had been converted to an affidavit
 
 
 [2]
 The petitioner also contends that the jury in this case was not rational. As stated by the Supreme Court in Jackson, "[t]he question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached." Jackson, 443 U.S. at 319 n. 13. It is not our task to evaluate the reasoning process used by the jury, but only to determine whether any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt